UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 6:22-CR-041-CHB-2 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| JEREMY D. ELLIOTTE, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Recommended Disposition, [R. 88], issued by United States Magistrate Judge Hanly A. Ingram, which addresses Defendant Jeremy D. Elliotte's Motion to Suppress Evidence Subject to *Garrity v. New Jersey*[1] ("Motion to Suppress"), [R. 55]. The United States responded to the Motion to Suppress, [R. 59], and Elliotte replied, [R. 61]. The Magistrate Judge then conducted a two-day evidentiary hearing on March 15 and March 30, 2023. *See* [R. 83 (Mar. 15, 2023 Transcript); R. 84 (Mar. 30, 2023 Transcript)]. The parties filed post-hearing briefs, [R. 85; R. 86; R. 87]. On June 27, 2023, the Magistrate Judge issued his Recommended Disposition, recommending that the Motion to Suppress be granted. [R. 88]. The United States then filed objections to the Recommended Disposition, [R. 91]. Elliotte responded to those objections, [R. 95], and the United States replied, [R. 96]. This matter is therefore fully briefed and ripe for review. For the reasons set forth herein, the Court will grant in part and deny in part the Motion to Suppress, [R. 55].

---

[1] *See Garrity v. New Jersey*, 385 U.S. 493 (1967).

## I.  BACKGROUND

### A.  August 18, 2020 Use-of-Force Incident

On or about August 17, 2020, Defendant Derek Lovett, a Kentucky State Police ("KSP") officer, discovered that someone had attempted to set fire to his home. *See* [R. 55-11, p. 6 (Partially Redacted RR Memorandum)]. KSP officers and detectives soon arrived on the scene and began an investigation into the suspected arson. *Id.* at 6–7. During the investigation, Bradley Hamblin was identified as a suspect. *Id.* at 20–21. In the early morning hours of August 18, 2020, KSP officers, including Defendants Elliotte and Lovett, arrested Hamblin. *See, e.g.*, [R. 55-10, ¶ 4 (Dingess Affidavit)]. Defendant Howell was also on the scene. *See* [R. 55-11, p. 27]. During the arrest, Hamblin allegedly resisted and was physically struck by at least one KSP officer. *See, e.g.*, [R. 55-6 (Resisting Arrest Records)]; [R. 55-11, p. 8].

### B.  Response to Resistance Procedures and Subsequent Internal Affairs Inquiry

When an officer uses force against an arrestee like Hamblin, KSP policy mandates that certain procedures take place, namely, a Response to Resistance ("RR") investigation.[2] *See* [R. 55-8 (RR Policy)]. Pursuant to this policy, when a use-of-force incident occurs, "the involved officer shall notify a Chapter 16 supervisor who shall immediately respond to the incident and initiate a *Response to Resistance Report*." *Id.* at 2.[3] To prepare the RR Report, "[t]he investigating supervisor shall interview the involved KSP officer(s). This interview shall be audio-recorded." *Id.* at 5. The "investigating supervisor" must provide his RR Report to the Internal Affairs branch within ten days of the incident. *Id.*

---

[2] The RR Policy is contained within General Order OM-B-4a. *See* [R. 55-8]. For ease of reference, however, the Court refers to this General Order as the "RR Policy." Additionally, while the Court refers to the phrase "Response to Resistance" as "RR," it is sometimes referred to as "RNR" in the transcripts and "R&R" in the written filings.

[3] The Court refers to the page number listed on the bottom of the RR Policy, rather than the page number assigned by the Court's electronic docketing system.

Pursuant to the RR Policy, Elliotte contacted his on-call supervisor, KSP Sergeant Jason Partin, in the early morning hours of August 18, 2020 to report that he had been involved in the use-of-force incident against Hamblin. *See, e.g.*, [R. 55-11, p. 7]. Sergeant Partin directed Elliotte to transport Hamblin to the hospital. [R. 83, p. 208:20–24]. Sergeant Partin then met Elliotte at the hospital and asked a series of questions about the circumstances of the arrest and Hamblin's injuries. *Id.* at 28:18–25, 29:1–3. Sergeant Partin also took various photographs of Elliotte and Lovett. *Id.* at 30:4–8; [R. 55-11, p. 8].

Sergeant Partin then directed Elliotte to meet at Post 11 for a recorded interview. [R. 83, p. 30:9–11]. That interview took place on August 20, 2020. *See, e.g.*, *id.* at 210:4–16. In addition to interviewing Elliotte, Sergeant Partin also separately interviewed the other KSP officers involved in the August 18, 2020 arrest. *See id.* at 30:12–22; [R. 55-10, ¶ 6]; [R. 55–11]. After these interviews, Sergeant Partin discovered that Defendant Howell's in-car dashboard camera had inadvertently recorded a conversation between Howell and Elliotte. [R. 83, pp. 85:17–25, 86:1–8. That conversation, in which Elliotte and Howell discussed the use of force against Hamblin, led Sergeant Partin to "have some concerns" about the use-of-force incident. *Id.* at 85:20–25, 86:1.

In September 2020, Sergeant Partin submitted his RR report, which concluded that Elliotte and Lovett did *not* use a reasonable amount of force during Hamblin's arrest. *See* [R. 55-11 (Partially Redacted RR Report)]. On September 30, 2020, KSP Captain John Felder sent the RR report to KSP's Internal Affairs Branch and requested an Internal Affairs Inquiry. [R. 59, p. 4].[4]

---

[4] To the extent the Court cites to the parties' briefing in this Background section, the Court notes that neither party disputes the cited facts, and those facts are offered only to provide an overview of the events leading up to the present motion.

An Internal Affairs Inquiry was opened in October 2020. *Id*. On March 24, 2021, Lieutenant Joey Vorbeck, who had been assigned to the inquiry, interviewed Elliotte. *Id.* In doing so, Lieutenant Vorbeck provided Elliotte with the Admonition of Rights for Internal Investigations, which states that all answers must be truthful, and the employee can invoke his or her right to remain silent if an answer would tend to incriminate them. *See* [R. 59-3 (Signed Admonition of Rights)]. The Admonition of Rights further provides that an employee's answers will not be used against them in a criminal proceeding and advises that a refusal to answer (not based on the Fifth Amendment) could result in discipline. *Id* Elliotte signed the Admonition of Rights and presumably provided a statement to Lieutenant Vorbeck. *Id.* Elliotte was ultimately suspended. *See* [R. 83, p. 251:8–9 (referencing suspension)].

## C.  Criminal Charges

On June 23, 2022, a grand jury indicted Defendant Howell on two counts of violating 18 U.S.C. § 1512(b)(3).[5] [R. 2 (Indictment)]. On August 17, 2022, a grand jury returned a Superseding Indictment, adding Elliotte and Lovett as defendants. [R. 14 (Superseding Indictment)]. The Superseding Indictment names Defendant Elliotte in four counts.[6] First, in Count 1, the Superseding Indictment charges Defendants Elliotte and Lovett with willfully depriving Bradley Hamblin[7] of the right "to be free from unreasonable seizures, which includes the right to be free from the use of unreasonable force by an officer" by "assault[ing] [Hamblin]

---

[5] Section 1512(b)(3) provides that "[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, attempts to do so, or engages in misleading conduct toward another person with intent to hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . shall be fined under this title or imprisoned not more than 20 years, or both."

[6] Count 5 names only Defendant Howell, and Count 6 names only Defendant Lovett. *See* [R. 14, pp. 6–7]. Both are obstruction of justice charges similar to Count 4 against Defendant Elliotte. *Id*.

[7] The Superseding Indictment identifies Hamblin as "B.H.," but he was identified by his full name in open court, and further, he has a related civil-rights lawsuit pending. *See Hamblin v. Elliotte, et al.*, 6:20-CV-245-KKC-HAI.

without legitimate law enforcement justification, resulting in bodily injury to [Hamblin]," in violation of 18 U.S.C. §§ 242 and 2. *See* [R. 14, p. 2]. In Count 2, the Superseding Indictment charges Defendant Elliotte with "willfully depriv[ing] S.B., D.C., and C.C. of the right . . . to be free from unreasonable searches" by "unlawfully enter[ing] the home in which S.B., D.C., and C.C. were residing, without a warrant and without other legal justification," in violation of 18 U.S.C. § 242. *See* [R. 14, p. 3]. The Court refers to Counts I and II as the "civil rights violations."

In Count Three, the Superseding Indictment charges Defendants Elliotte, Howell, and Lovett with knowingly and willfully conspiring "to violate 18 U.S.C. § 1512(b)(3) by knowingly engaging in misleading conduct toward another person with the intent to hinder, delay, and prevent the communication of information to a federal law enforcement officer and judge relating to the commission and possible commission of a federal offense." *See* [R. 14, p. 3]. Specifically, the Superseding Indictment alleges that the defendants "carried out the conspiracy by, among other things, agreeing upon a false narrative and agreeing to stick with that narrative when being interviewed by supervisors." *Id.* at 4. Among the alleged overt acts listed in the Superseding Indictment is Elliotte's August 20, 2020 interview, in which Elliotte allegedly "stuck to the agreed-upon cover story and knowingly misled his supervisor." *Id.*

Lastly, in Count Four, the Superseding Indictment alleges that Defendant Elliotte "knowingly engaged in misleading conduct toward another person with the intent to hinder, delay, and prevent the communication to a federal law enforcement officer and judge of information relating to the commission and possible commission of a federal offense," in violation of 18 U.S.C. § 1512(b)(3). *See* [R. 14, p. 6]. With respect to Count Four, the Superseding Indictment again references the August 20, 2020 interview and alleges that Elliotte

"repeated the agreed upon cover story and knowingly misled his supervisor," referring to the RR interview. *Id.* The Court refers to Counts 3 and 4 as the "obstruction of justice" charges.

### D.  Motion to Suppress

On January 13, 2023, Defendant Elliotte filed his Motion to Suppress Evidence Subject to *Garrity v. New Jersey*, [R. 55]. In his motion, Elliotte argues that certain statements made during the RR procedures were coerced and are therefore inadmissible against him in this criminal prosecution. Specifically, he seeks to suppress all statements made to KSP investigators (and specifically, his supervisor, Sergeant Partin) during the RR procedures that followed the August 18, 2020 use-of-force incident. *See generally* [R. 55; R. 85; R. 95]. This would include statements made by Elliotte to Sergeant Partin between August 18 and August 20, 2020, including the recorded RR interview on August 20, 2020.[8] The United States responded to these arguments, [R. 59], and Elliotte replied, [R. 61]. The parties' briefing includes various exhibits, *see, e.g.*, [R. 58], and Elliotte also filed grand jury transcripts. *See* [R. 66].

Magistrate Judge Ingram then conducted a two-day evidentiary hearing on March 15, 2023 and March 30, 2023. *See* [R. 77 (Mar. 15 Minutes); R. 80 (Mar. 30 Minutes)]. Elliotte testified at the hearing and called multiple witnesses, including Sergeant Partin, KSP General Counsel Shawna Kincer, and KSP Lieutenant Clyde Anthony "Tony" Dingess. *See* [R. 83 (Mar. 15 Transcript)]; [R. 84 (Mar. 30 Transcript)]. The United States called James Henry "Trey" Green from KSP's Internal Affairs Branch. [R. 84, pp. 29–89].

---

[8] Elliotte also seeks to suppress "all evidence derived from those statements," [R. 55, p. 1].

### E.  Summary of the Evidence

The Magistrate Judge provided a detailed summary of the testimony from the evidentiary hearing and the other evidence of record. The Court will also summarize the testimony and evidence and, in doing so, adopts much of the Magistrate Judge's summary.[9]

#### 1.  Affidavits

Elliotte attached his own affidavit to his Motion to Suppress. *See* [R. 55-9 (Elliotte Affidavit)]. His affidavit explains that Elliotte reported the use-of-force incident to his direct supervisor, Sergeant Partin, because Elliotte believed "KSP policy required [him] to notify Partin and to provide details about the incident necessitating report." *Id.* at ¶ 5. He also explains the events that followed:

> 6. During the minutes, hours, and days that followed, Sergeant Partin gave me a series of directives and made several inquiries of me. He instructed me to meet him at Baptist Health Corbin Hospital. He directed me to pose for photographs he took of my hands, face, and clothing. During at least three stages, (*i.e.*, my initial conversation with Sergeant Partin while I was still at the scene of the incident, my discussions with him at the hospital, and an interview on August 20, 2020, at KSP Post 11), he asked me detailed questions about the incident, the arrestee's injuries, and what I and other troopers saw, heard, and did between August 17 and 18, 2020, among many other questions.
>
> 7. During every interaction I had with Sergeant Partin about this particular response to resistance, I answered his questions and followed his directives because I believed that I was required to answer and cooperate with his investigation. It was my understanding and belief at the time that Kentucky State Police troopers were not permitted by policy and prevailing practices to refuse to answer questions of or follow instructions given by a superior officer in the course of a response to resistance investigation. I believed then that such a refusal would result in me being deemed insubordinate and therefore terminated, demoted, or suspended. I was specifically aware that KSP policy called for termination, demotion, or suspension of troopers who were insubordinate.

---

[9] To the extent the parties dispute the Magistrate Judge's summarization of the facts, the Court addresses those concerns below, when relevant.

Elliotte's affidavit also explains that he had reviewed the RR Policy "several times in the past," and he "always understood and interpreted the policy to require me to not only report physical responses to resistance that resulted in injury to arrestees but to also cooperate completely with any ensuing KSP investigations." *Id.* at ¶ 8. He also believed that "a Response to Resistance investigation was a form of internal investigation for which [he] had no choice but to cooperate." *Id.*

Elliotte also attached to his Motion to Suppress an affidavit of Lieutenant Dingess. [R. 55-10]. Dingess's affidavit mirrored Elliotte's "understanding and belief that Kentucky State Police troopers are not permitted by policy and prevailing practices to refuse to answer questions of or follow instructions given by a superior officer in the course of a response to resistance investigation." *Id.* ¶ 7. He also explained that he had always understood that "statements made by troopers during a response to resistance investigation are subject to *Garrity* protections pursuant to Kentucky State Police policies and procedures." *Id.* ¶ 8.  Lieutenant Dingess further opined that had Elliotte refused to answer the RR questions, he would have "ultimately been disciplined and an internal affairs investigation would have been opened for insubordination which would result in disciplinary actions." *Id.* ¶ 9.

### 2.  KSP Policies

The parties' exhibits include several KSP General Orders that detail various KSP policies and procedures. These General Orders were also admitted as exhibits at the evidentiary hearing (including one not previously filed, General Order AM-E-3, regarding standards of conduct). The various policies include the following:

General Order AM-B-2 discusses the organizational structure of KSP, including the "chain of command" policy utilized by KSP. [R. 55-12]. General Order AM-B-3 then describes

the KSP's "Commanding Officers Supervisors & Change of Command" policy. [R. 55-13].

Among other things, this policy establishes that "[s]upervisory responsibility shall be

accompanied by commensurate authority." *Id.* at 2.[10]  Sergeant Partin testified that this policy

statement gives him authority to "command" and "hand down orders to" troopers. [R. 83,

pp. 37:22–25, 38:1–9].

General Order AM-E-3 describes KSP's "Standards of Conduct." [R. 55-14]. Among

other things, it describes various Class A violations, including "Insubordination" and

"Obstructing an Internal Investigation." These provisions are hereafter referred to as the

"Insubordination Policy" and the "Obstruction Policy," as the parties often use this same

reference in their briefing.

The Insubordination Policy states, in full:

> Officers shall promptly obey any lawful orders of a superior officer, to include
> orders relayed from a superior officer by an officer of the same or lesser rank.
> Officers who are given an otherwise proper order, which is in conflict with a
> previous order, or with any rule or regulation, whether stated in this regulation or
> elsewhere, shall respectfully inform the superior officer issuing the order of the
> conflict. If the superior officer issuing the order does not amend or retract the
> conflicting order, the order shall be promptly obeyed, with responsibility for the
> conflict to be on the officer issuing the order. Officers shall not obey orders, which
> require them to commit any illegal act. Insubordination is a Class A violation.

*Id.* at 3–4, ¶ 9.

The Obstruction Policy states, in full:

> No officer shall destroy, conceal or alter any record, or attempt to coerce or
> intimidate, or attempt to influence the testimony of, any witness or potential witness
> in any internal investigation of alleged misconduct. This shall include officers
> contacting or attempting to contact the complainant and/or witnesses, or otherwise
> discussing the case with unauthorized persons, after they become aware of a
> complaint against them and any ensuing investigation. Upon order of the

---

[10] To the extent the page number listed on the various policies (or any other exhibits) differs from the page number assigned by the Court's electronic docketing system, the Court cites to the page number listed on the original document (not the electronically assigned page number).

Commissioner, the Commissioner's designee, or their commanding officer, officers must answer and answer truthfully to any questions specifically directed and narrowly-related to the scope of employment and operations of the agency which may be asked of them. No officer shall refuse or knowingly fail or omit to answer fully and truthfully all questions specifically directed and narrowly related to the scope of employment and operations of the agency, which may be asked. Obstructing an internal investigation is a Class A violation.

*Id.* at 4, ¶ 10.

General Order AM-E-1 (hereafter, "Agency Disciplinary System Policy") describes KSP's disciplinary system. [R. 55-15]. It explains the potential penalties for committing a Class A violation. Specifically, it states that Class A violations "shall include dismissal, reduction in rank or pay, or suspension without pay for at least 21 working days." *Id.* at 10.

General Order OM-B-4a contains the RR Policy, and it governs the reporting, investigation, and review of RR investigations. [R. 55-8]. As already explained, when a KSP officer is involved in a use-of-force incident (including one that results in an injury requiring medical treatment, as was the case here), the involved officer must notify his supervisor, who then begins an RR investigation. *Id.* at 2. The supervisor must interview the involved officers and prepare an RR report. *Id.*

The parties also submitted General Order AM-C-13, which describes KSP's Field Reporting System, [R. 59-4], and General Order AM-E-2, which discusses the procedures for completing and submitting Internal Affairs investigations, [R. 59-6]. The latter is hereafter referred to as the Internal Affairs Policy. It explains that officers under an Internal Affairs investigation are required to answer questions during an interview, but their statements are subject to *Garrity* protection, and they should be read *Garrity* warnings. *Id.* at 2–3.

### 3. Other Documents

Elliotte also attached to his briefing a December 2020 email from KSP's General

Counsel, Shawna Kincer, addressed to the FBI case agent on this matter, Chris Hubbuch. [R. 61-

2]. That email states,

> I apologize but I was not considering the response to resistance investigation when
> I sent the last email. Although [KSP internal affairs] has not started their
> investigation, the Officers were interviewed during the RR investigation and
> Garrity would apply to that part. We will have to separate that section out on a
> separate thumb drive.

*Id.*

Also included among the parties' exhibits is a redacted version of Sergeant Partin's RR

Report. *See* [R. 55-11 (Partially Redacted RR Report)]; [R. 59-2 (same)]. An unredacted version

was admitted under seal at the evidentiary hearing.

The parties have also submitted photographs and reports from the arson incident

involving Hamblin, [R. 55-1; R. 55-2; R. 55-3; R. 55-4; R. 55-6; R. 55-7]; transcript excerpts

from other voluntary interviews involving Elliotte, [R. 55-16]; a teletype report of the use-of-

force incident, [R. 59-1]; and an "Admonition of Rights for Internal Administrative

Investigations" form, signed by Elliotte prior to his Internal Affairs interview. [R. 59-3].[11]

### 4.  Sergeant Partin's Testimony

Sergeant Partin was the first witness to testify at the evidentiary hearing. The Magistrate

Judge provided the following summary of Sergeant Partin's testimony:

> The first defense witness at the March 15, 2023 evidentiary hearing was KSP Sgt.
> Jason Tilmon Partin. Sgt. Partin was Defendant's immediate supervisor in August
> 2020, and he conducted the RR interview and drafted the RR report. Partin has been
> with KSP since January 2009. [R. 83, p. 10]. He has been a sergeant since
> September 2015. *Id*. at 10–11.
>
> Sgt. Partin explained that, under KSP policies, he must initiate a response-to-
> resistance investigation whenever one of his subordinate officers uses force that

---

[11] The Magistrate Judge referred to the Admonition of Rights form, [R. 59-3], as concerning "an unrelated earlier
incident." [R. 88, p. 25]. The Court understands, however, that this document relates to the Internal Affairs
investigation that followed Sergeant Partin's RR report in this case.

results in injury to the suspect that requires medical attention. An RR is a form of administrative internal investigation inside KSP. *Id*. at 12. He has conducted "8 to 10 to 12" RRs so far in his career as a sergeant. *Id*. at 14. He explained that RR investigations are different from internal-affairs ("IA") investigations. *Id*. at 12–13. However, RR reports go to the internal affairs division, and the internal affairs division often bases its own investigation on the initial RR reports and accompanying materials. An RR investigation can be a building block upon which an IA investigation is based. *Id*. at 45. An IA investigation can look into potential crimes or potential policy violations. *Id*. at 87. Sgt. Partin said that RR reports can eventually lead to internal punishments and even criminal prosecutions in some cases. *Id*. at 13.

Sgt. Partin testified that, under KSP policies, whenever an officer uses force that results in physical injury requiring medical attention, the officer is required to report it. Then, the investigating supervisor must conduct an RR investigation. The investigator must interview all troopers involved, and must, under the policies, record the interviews. [R. 83, pp. 25–28]. Sgt. Partin testified that if a trooper ever failed to report a qualifying use-of-force incident, he would expect that trooper to be disciplined. *Id*. at 26–27. Concerning RR investigations, he said no officer has ever refused to answer one of his questions. *Id*. at 39–40, 58–59. He testified the KSP has a militaristic chain-of-command and he has authority to give orders to troopers below him. *Id*. at 37–38.

As for the investigation at issue here, Sgt. Partin testified it was Defendant who reported the use of force over the radio. [R. 83, pp. 29, 33, 56]. Sgt. Partin told Defendant to meet him at the Corbin hospital. This was in the early morning following the arrest. There, Sgt. Partin asked Defendant questions about the arrest and Hamblin's injuries. And he took photos. *Id*. at 29–30. Sgt. Partin later told Defendant to meet him at Post 11 in London for a more formal interview. This interview occurred a couple of days later. At the interview, Sgt. Partin had Defendant leave his phone and Apple watch in a different room. Sgt. Partin said this was done to avoid interruptions and because Defendant did not need to record the interview himself. *Id*. at 30–31. Sgt. Partin first conducted a group pre-interview with all the officers who were involved. Then, Sgt. Partin interviewed Defendant one-on-one in one of the interrogation rooms. *Id*. at 31–32. Sgt. Partin considered Defendant to be "confined" during this interview. He did not tell Defendant he was or was not free to leave. This interview, unlike the previous conversations, was audio recorded. *Id*. Defendant fully cooperated, and Sgt. Partin did not threaten him with any sanctions. Defendant expressed no concerns and did not hesitate to answer Partin's questions. *Id*. at 33–35, 66–67.

Sgt. Partin made some statements about whether the RR investigation was "administrative," "criminal," and/or "routine." He agreed that "a response to resistance investigation is sort of a form of administrative internal investigation inside KSP." [R. 83, p. 12]. RRs and IA investigations are the two types of "internal investigations." *Id*. at 12–13. RRs can be "serious" in that they can lead to internal

punishments and criminal investigations. But Sgt. Partin has never had an RR, aside from the one in this case, that led to internal punishment. *Id.* at 13.

[R. 88, pp. 25–27].

During cross-examination, Sergeant Partin explained that the RR investigation "was an administrative investigation." [R. 83, p. 67:12–13]. He did not believe that Elliotte would have "thought that it was a criminal investigation." *Id.* at 67:13–14. And Sergeant Partin agreed that the RR investigation was *not* criminal, but was instead an "administrative investigation." *Id.* at 67:15–19. He further testified that the RR investigations are a matter of routine, in that they are triggered by the use of force, not suspected misconduct. *Id.* at 67:20–25, 68:1–17]. Internal Affairs investigations, on the other hand, are triggered by specific allegations of misconduct or policy violations. *Id.* at 70:9–23.

The remainder of Sergeant Partin's testimony was summarized by the Magistrate Judge as follows:

> Sgt. Partin testified that, at the beginning of the investigation, Partin had no concerns about Defendant's use of force on Hamblin. [R. 83, pp. 84–85]. Sgt. Partin said that assessing the trooper's truthfulness is part of the interview, and Defendant appeared truthful during the interview. However, after the RR interview, Partin heard an inadvertently recorded conversation from Trooper Howell's dashcam, which caused him to become concerned. *Id.* at 85–87. Sgt. Partin testified that, as to Defendant in this matter, he determined at the end of the RR investigation that Defendant had violated KSP policies. *Id.* at 18.
>
> Sgt. Partin had never heard of a KSP officer refusing to cooperate fully with an RR investigation. He said that if it did happen, he would consult with the legal department for advice on how to proceed. [R. 83, pp. 39–40, 59–60, 77].
>
> Sgt. Partin testified he is familiar with KSP policies. And he believes KSP policies required Defendant to fully answer all Partin's questions and fully cooperate with the RR investigation. Otherwise, he testified, Defendant could face discipline for insubordination or obstructing an internal investigation. He said these would be Class A violations that could lead to termination. Sgt. Partin read from the AM-E-1 policy statement, under which a "Class A violation shall include dismissal, reduction in rank or pay, or suspension without pay for at least 21 working days." [R. 83, pp. 35, 39–44]. He read paragraph 10 of page four of the AM-E-3, the KSP's "Standards of Conduct" policy, which states:

- 13 -

Upon order of . . . their commanding officer, officers must answer and answer truthfully to any questions specifically directed and narrowly-related to the scope of employment and operations of the agency which may be asked of them. No officer shall refuse or knowingly fail or omit to answer fully and truthfully all questions specifically directed and narrowly related to the scope of employment and operations of the agency, which may be asked. Obstructing an internal investigation is a Class A violation.

*Id.* at 41. Sgt. Partin testified he believed this policy was applicable when he was questioning Defendant in the RR investigation. He was conducting an internal investigation (though not an "internal affairs" investigation). And he was asking questions related to Defendant's scope of employment and operations of the agency. *Id.* at 4–42. He believes the questions he asks his troopers come with an implied order to answer truthfully. *Id.* at 88.

Sgt. Partin testified he possesses some power to immediately discipline troopers under his command. He has never done it, but the policies give him the power of temporary summary suspension. He cannot on his own give out Class-A-violation discipline. [R. 83, pp. 46–47].

Sgt. Partin testified that, when he conducted Defendant's RR investigation, back when he was a "road trooper," and even now, he has always believed that refusal to truthfully answer a superior officer's question would be insubordination. He had been subject to RRs himself, and never believed that refusal to answer was an option. [R. 83, pp. 52–53]. He said troopers are tested on these policies and procedures and there is a general culture in the KSP that troopers have to answer RR questions. Accordingly, he felt no need to warn or to direct Defendant to answer his questions. He had never ordered a trooper to answer him because the need had never arisen. *Id.* at 52–54.

[R. 88, pp. 28–30].

### 5. General Counsel Kincer's Testimony

Shawna Kincer, General Counsel for KSP, also testified at the evidentiary hearing. The

Magistrate Judge provided a detailed summary of her testimony, much of which is recited below:

Attorney Shawna Kincer has been general counsel at KSP for six years, and since 2020 she has also been the Police Commissioner's executive advisor. She is the top attorney at the agency and answers directly to the Commissioner. Part of her job is representing troopers and the KSP in court. She is also part of the disciplinary process for troopers. [R. 83, pp. 98–100]. She is involved in IA and RR investigations. As part of the "classification committee," she is also involved in classifying policy violations. Her job involves interpreting policies and giving

advice on policy changes. *Id*. at 100–03. In her role, she supervises five other attorneys, a paralegal, and records custodians. *Id*. at 99.

Ms. Kincer's testimony on RR and IA investigations tracked with Sgt. Partin's. She agreed that RR investigations are serious. They can become the building blocks of later IA investigations, which can then result in internal punishments through internal affairs. [R. 83, pp. 105–06]. Ms. Kincer testified that she signs off on all RR reports. None of them moves forward without her signature. She reviews them as to whether she agrees with the investigator as to whether KSP policies have been violated. She has been involved in "hundreds and hundreds" of RRs. *Id*. at 106–07. She agreed that when there is a use of force that causes injuries requiring medical treatment, the trooper involved is obligated to report it. Then the trooper's supervisor is obligated to conduct an RR investigation and conduct a recorded interview. *Id*. at 111–13.

Ms. Kincer was shown a heavily redacted copy of Sgt. Partin's RR report in this matter. She testified that she had provided this version of the report to FBI Special Agent Hubbuch. Her staff redacted it because they believed certain statements were protected by *Garrity*. They had redacted "twenty-something" pages from it. *Id*. at 118–21, 158. Ms. Kincer testified that SA Hubbuch may have obtained his unredacted version of Defendant's RR report due to an "error" by a lieutenant.

[R. 88, pp. 30–31].

Ms. Kincer testified that she believed Defendant's RR statements were compelled under threat of substantial penalties and therefore warrant *Garrity* protection.

Like Sgt. Partin, Ms. Kincer believes that a superior officer's question comes with an implied order to answer the question truthfully. [R. 83, p. 159]. Ms. Kincer testified that a trooper's obligation to answer a superior officer's questions is part of

> our history. That's the way that we have always operated. It is the culture. It's [a] paramilitary organization. We don't have an Officer's Bill of Rights. We're not protected that [way]. . . . All we have is our integrity and our word; and so [a trooper is] expected to cooperate and to answer all questions. Otherwise, you're subject to violation of our Standards of Conduct, potentially. To me, that feels compelled.

*Id*. at 137.

[R. 88, p. 32].

Ms. Kincer also testified about her December 2020 email, [R. 61-2]. She testified that, at

the time she wrote the email, she believed that a KSP officer's statements, made to an

investigating supervisor during an RR investigation, were protected by *Garrity*. [R. 83, p. 122:15–19]. She also explained her belief that KSP's policies required its officers to answer an investigating officer's questions, and the paramilitary structure of KSP mandated that KSP officers answer questions from their superiors during RR investigations. *Id.* at 122:20–23. When asked whether an officer might be punished for insubordination, a Class A violation, for refusing to answer such questions, Ms. Kincer responded:

> A. You know, the situation's never happened. So I don't know in reality how this process would play out, but I do believe that they are compelled to cooperate and be honest.
>
> Q. If you couldn't be certain about how it would play out as KSP's highest-ranking attorney, could you ever find fault in a trooper who had some uncertainty about that?
>
> A. Probably not. I mean, troopers are taught from the very beginning honesty is all you have and to be honest. That's day one.

*Id.* at 123:10–20. Ms. Kincer also testified that failure to answer questions during an internal investigation could be obstruction, another Class A violation, and an RR investigation was a type of internal investigation. *Id.* at 125:6–20.

Ms. Kincer further testified that she was unaware of any instance in which a KSP trooper's RR statements had been used against the officer in a subsequent criminal proceeding. *Id.* at 129:1–4. She explained that this was "[p]robably" because KSP's long-standing practice had been to treat those statements as *Garrity*-protected, regardless of whether a *Garrity* warning was expressly provided. *Id.* at 129:5–21.

Ms. Kincer also provided insight into the paramilitary culture at KSP and its policies. For example, she stated,

> So we have a chain of discipline, a chain of command. . . . [Troopers] feel compelled to answer truthfully and honestly and cooperate. They don't have a bill of rights. [The RR policy may not be written] exactly that way, that the officers

shall answer, but when [the RR policy says] the supervisor shall do this and they
have to answer to a chain of command, [the troopers] feel compelled.

*Id.* at 148:20–25, 149:1.

The Magistrate Judge summarized the remainder of Ms. Kincer's testimony as follows:

[Ms. Kincer] said that if a trooper ever invoked the right to be silent under the Fifth
Amendment in a RR or IA interview, most likely the interview would stop and the
matter would be referred to her. It would "potentially" result in discipline for a
policy violation and they would "probably contact the local prosecutor and see
what, if any, action they wanted to take." [R. 83, pp. 140–44].

Ms. Kincer testified that at one point, after this case was initiated, the KSP decided
to give *Garrity* warnings at RR interviews. They trained one class of sergeants to
do this. But then they discontinued doing this after a matter arose in Seattle where
the DOJ asked a police department to stop giving *Garrity* warnings in use-of-force
investigations. [R. 83, pp. 144–54]. She later clarified that (based on updated
guidance from the DOJ since the investigation in this case) if a trooper pled the
Fifth in an RR investigation, they would probably read the trooper *Garrity* and
proceed to compel a statement. *Id.* at 154.

The Court asked Ms. Kincer whether the RR investigation found Defendant to be
dishonest. She explained that the RR concluded the use of force was unjustified,
but she did not recall it including a finding that Defendant had been dishonest.
[R. 83, pp. 162–63].[12]

. . . .

Ms. Kincer testified unambiguously she believed that Defendant's statements were
*Garrity*-protected at the time she provided the RR report to the FBI. She testified
she currently lacks such certainty because of the dispute in this case. But she also
testified that if a trooper refused to answer questions in an RR interview, she would
have *Garrity* warnings given and would compel a statement. Thus, Ms. Kincer did
not testify (as the government contends) that she currently believes Defendant's RR
statements were not *Garrity* protected.

[R. 88, pp. 36–37].

### 6.  Lieutenant Dingess's Testimony

---

[12] Here, the Magistrate Judge next addressed the United States' contention that "Kincer [testified] she now no longer
asserts that the Defendant's RR statements were *Garrity*-compelled." [R. 88, p. 36 (citing R. 86 at 14 n.4). The
Magistrate Judge explained that "Ms. Kincer did not actually repudiate her belief that Defendant's RR interview was
*Garrity* protected." *Id.*

Elliotte also called as a witness former KSP Lieutenant Dingess, who retired from KSP with over eighteen years of service. [R. 88, p. 38]. The Magistrate Judge summarized his testimony as follows:

> [Lieutenant Dingess] used to be "investigative Lieutenant" at the London post. But now he is "chief deputy" of the Whitley County Sheriff's Office. [R. 83, p. 166]. The Whitley County Sheriff is Defendant's father. *Id*. at 175.

> Lt. Dingess said he has known Defendant since Defendant was middle-school-age. Dingess worked with Defendant's father at KSP, and he thinks "a lot of" Defendant's family. [R. 83, p. 175]. In his current job he serves "at the pleasure" of Defendant's father, the Sheriff. *Id*. at 194. He said that, though he respects Defendant's family, he would not perjure himself. *Id*. at 175–76.

> Lt. Dingess explained that, in his former role at KSP, he was involved in thirty to fifty RR investigations—both as a trooper and a supervisor. [R. 83, pp. 168–69]. He said the purpose of an RR investigation "is to determine if there's been any kind of violation of Kentucky State Police policies and procedures, see if the response to resistance was justified, to gather all the facts and statements of the parties or witnesses." *Id*. at 168. RR investigations do not require a suspicion of misconduct. *Id*. at 180. Like the previous witnesses, Dingess testified that when a qualifying use-of-force incident occurs, the trooper must report it and the supervisor must interview and record every trooper involved in the incident. *Id*. at 169. RR and IA investigations are intertwined, as Internal Affairs assigns the RR case number, and then the RR report becomes a "resource document" for any IA investigation. *Id*. at 195–96. It is "absolutely" true that an RR report may become a building block of a later IA investigation. *Id*.

> Lt. Dingess agreed with the previous witnesses that troopers must answer questions in RR interviews. "They have to answer." [R. 83, p. 171]. It is a "common perception" among troopers that they must answer their supervisors' questions; it is "ingrained from day one in the academy." *Id*. Lt. Dingess had never heard of a KSP trooper refusing to answer RR questions. *Id*. at 171, 201. He said doing so would be insubordination and obstruction—Class A policy violations that could result in termination. *Id*. at 172–73, 181–83, 194–95. He said the answers are "compelled" in RR interviews in that "the trooper has to appear and participate." *Id*. at 182.

> Lt. Dingess said that anytime a superior officer questions a subordinate, the answer is compelled on an implied threat of an investigation for insubordination. [R. 83, pp. 181–83]. Lt. Dingess has never had to order a trooper to answer a question. If a trooper refused to answer, Lt. Dingess believed that the trooper would face an IA investigation—it's a "common perception" in the KSP that a failure to answer

would be the same as failure to follow a direct order and that an IA investigation would commence. *Id*. at 200–01.

Lt. Dingess testified he and Sgt. Partin had discussed whether Defendant's RR statements were protected by *Garrity*, and they both thought they were. [R. 83, p. 170]. Lt. Dingess has always believed RR statements were protected under *Garrity*. He had never seen RR statements used in a criminal investigation. *Id*. at 171.

Lt. Dingess explained that terminating a trooper for misconduct requires several steps, including the involvement of the legal department and the Commissioner. [R. 83, pp. 186–89]. But he said that, as a KSP supervisor, he could summarily suspend an officer in some circumstances. *Id*. at 185–86. And post commanders can at any time and for any reason take actions such as transfer of county assignment, changes to days off, and change of duties within the post district. *Id*. at 198–99.

If a trooper had ever refused to answer one of his questions, Lt. Dingess would go up the chain of command for guidance. [R. 83, pp. 178–79]. If a trooper ever pleaded the Fifth, it would "immediately" become an IA investigation. *Id*. at 186. Lt. Dingess also believed that any such insubordination would result in the post commander summarily transferring the Trooper: "my belief is, if the troopers [in this case had] refused to answer those questions for Sergeant Partin, they would have immediately been transferred from the work assignment. Days off, their schedules, all that is subject to change just at the whim of the [post] commander's discretion." *Id*. at 189–90. In fact, Lt. Dingess "had conversations [with Defendant's post commander] about [moving him and his codefendants] as soon as this [incident] happened." *Id*. at 190. "[T]here were discussions about moving their work assignments. And it's been historically known that a post commander can move anybody for any reason." *Id*. A transfer could mean the trooper will have to travel farther (without compensation) to the county of his assignment and he could lose any scheduled days off, among other consequences. *Id*. at 198–99.

Lt. Dingess said no RR he has ever been involved in had resulted in a finding of misconduct, so he and Sgt. Partin were not expecting to find misconduct in this case. [R. 83, pp. 180–81].

Lt. Dingess was also asked (on cross-examination) about whether RR investigations are "routine."

> Q: RR policies are routine? I mean RR investigations are routine, correct?

> A. I don't understand the question.

> Q. Is it common for there to be RNR investigations?

A. It's mandated that you do RNR. It's not common. It's a requirement such as you get a criminal complaint or an investigation. Any time you get those as a supervisor, you are required to do an investigation on them.

Q. Sure. And what triggers an RNR investigation is not a complaint, right?

A. It is a reported use of force by the trooper.

Q. Right. And so, no matter what happens with that use of force, if there is a use of force up to a certain level, an RNR is mandated, correct?

A. Yes. It's assigned from internal affairs branch.

Q. When you are conducting an RNR, there's not a requirement that any trooper be under investigation for misconduct, right?

A. No.

Q. In fact, since I'm sure . . . you agree, most of KSP's uses of force are justified, most of the time there are no misconduct findings as a result of an RNR investigation, right?

A. I have found none.

Q. In all the years, you have never found one?

A. In RNRs, correct.

Q. And so, therefore, you would agree many RNRs happen without any discipline ever occurring to the trooper, right?

A. Yes.

[R. 83, pp. 180–81].

On redirect, Lt. Dingess opined that RR investigations are not as routine as some other matters.

Q. Mr. Dembo asked you about a series of what I'll call more mundane things that troopers have to do, like citations, time cards or reports or property forms. And the questioning seemed to be asking you if those were in some ways the same as an RNR. Do you believe those things are the same as an RNR investigation?

A. No, sir, I don't.

- 20 -

Q. How are they different, sir?

A. Because those are mundane tasks that troopers do every day. It's not something that would ultimately more than likely result in an internal affairs investigation if they did not complete those.

Q. So based on your personal experience, as an administrator in the Kentucky State Police, is it your testimony that there's more gravity, more import to an RNR investigation and the questioning that goes with it than any of the things Mr. Dembo mentioned?

A. Yes.

Q. In fact, you would agree that sometimes RNR investigations snowball into criminal prosecutions, don't they?

A. They can.

*Id.* at 196–98.

[R. 88, pp. 38–42].

### 7. Defendant Elliotte's Testimony

The Magistrate Judge summarized Elliotte's testimony as follows:

Defendant entered the KSP academy in 2015. [R. 83, p. 204]. There, he was instructed and tested on KSP policies, including the RR policy. *Id.* at 205–06. After working briefly at the Hazard post, he transferred to the London post, where this incident occurred in August 2020. *Id.* at 204. He has been "put off work" since October 2020. *Id.* at 250. Since August 2022, he has been on unpaid suspension. *Id.* at 205. Defendant said he also wrote a citation and arson supplement concerning the August 2020 incident, as required by policy. *Id.* at 231, 237–38.

Defendant testified he has been subject to RR interviews twenty to 25 times. [R. 83, p. 206]. He said he felt he had a good understanding of how they worked. And he never believed that refusal to answer a question was an option—"absolutely not." *Id.* Like the other witnesses, he had never heard of a trooper refusing to answer a supervisor's question. Not answering questions is "absolutely unheard of. We all believe we were required to cooperate [with RRs]." *Id.* at 206–07.

Defendant had not previously been subject to an IA investigation. [R. 83, p. 214]. When interviewed by internal affairs in this matter, he was given the *Garrity* warnings. He had faced two CIRT (Critical Incident Response Team) investigations for discharging a firearm. *Id.* at 216. These investigations involve *Garrity* warnings.

- 21 -

CIRT tells you their investigation is criminal and cooperation is not compelled. Defendant testified he understands he has the right to remain silent in a CIRT investigation because it is a criminal investigation that is designed to result in a grand jury case if the firearm discharge is not justified. But he said RRs are internal administrative investigations, so full cooperation is required. *Id.* at 215–17.

Defendant testified that, on August 18, 2020, he radioed dispatch to report the use-of-force incident to Sgt. Partin because he was required to do so. [R. 83, p. 207–08]. While at the scene, he talked briefly to Partin over the radio or phone. Sgt. Partin ordered Defendant to take Hamblin to the hospital and meet Partin there. Throughout the interactions, Defendant answered all of Partin's questions. *Id.* at 208–09. Defendant believed not doing so would be insubordination, which could result in demotion, termination, or suspension without pay. *Id.* at 209–10, 213. Defendant also recalled meeting on August 20 with Partin and the other involved officers at Post 11. *Id.* at 210–11. After the group meeting, Sgt. Partin and Defendant did the one-on-one recorded RR interviews in a small interrogation room. *Id.* at 211. Partin told Defendant to leave behind his cellphone and Apple watch in his mailbox. *Id.* at 212. Partin recorded this 21-minute conversation. *Id.* at 212, 239. Defendant testified that every answer he gave Sgt. Partin was "100 percent truthful" and he made no attempt to mislead the investigation. *Id.* at 266–67. Partin's questions were not very detailed, compared to those in the later IA interview, which lasted over two hours. *Id.* at 266–70.

Defendant testified that, during the RR interview process, he did not feel free to refuse to answer questions. He said he had been trained that doing so would be a Class A violation. He said "KSP policy, the culture, the way I have been trained in the past" led him to believe there would be "serious consequences" for failure to answer Partin's questions. [R. 83, p. 213]. Partin never told him he had the option not to answer. *Id.* at 213–14.

Defendant said that, based on his understanding of *Garrity*, he believed he had a duty to comply with administrative investigations, and believed that his statements as part of the RR could not be used against him criminally. "It didn't even cross my mind [that my statements to Sgt. Partin could be used in court] because my training had told me that it couldn't happen and my experience had told me that that would be something that wouldn't happen." [R. 84, p. 15].

Defendant testified he believes the KSP has the right to compel statements in administrative investigations. The violation of his rights here, he said, is the use of his RR statements in a criminal prosecution. [R. 83, p. 244].

Defendant testified he has believed his *Garrity* rights were violated since before he even met his defense attorneys. [R. 84, p. 6]. He testified he became concerned about a potential *Garrity* violation at the meeting in October 2020 when he was suspended and learned that the matter was before a grand jury. *Id.* at 6, 23–24. He

said that when SA Hubbuch served him with the indictment, he complained to Hubbuch that the prosecution was violating his *Garrity* rights. [R. 83, p. 264].

[R. 88, pp. 42–44].

Elliotte also testified about the "routine" nature of RR investigations:

Q. Okay. And in the 20 to 25 previous response to resistance, nothing had happened even in IA, right?

A. Not that I'm aware of, no, sir.

Q. Okay. And so you didn't have any reason to think, based on your testimony, that you had done anything wrong that evening, correct?

A. No.

Q. And, therefore, your testimony is that this was what you thought was a routine administrative investigation at the time you were questioned by Sergeant Partin, correct?

A. Yeah. It was—it was just an administrative investigation, yes, sir.

[R. 84, p 26:13–21].

### 8.  Captain Green's Testimony

The final witness of the evidentiary hearing, and the only witness called by the United States, was Captain Green. The Magistrate Judge summarized his testimony as follows:

At the time of the hearing, he had been commander of the KSP internal affairs branch for almost a year. [R. 84, p. 30]. He was not involved in the investigation of Defendant. *Id*. For four years, Capt. Green was a Lieutenant with the Critical Incident Response Team ("CIRT"). CIRT gets involved whenever there is an officer-involved shooting or when someone dies in custody. CIRT investigations are "solely" criminal, and they occur prior to any "administrative" KSP investigation. *Id*. at 32–33.

Capt. Green had conducted few, if any, RR interviews himself. As a detective sergeant and CIRT member, he did only criminal, not administrative, investigations. Currently, he is rarely involved in RRs, as other members of the IA staff have more experience in administrative matters. [R. 84, p. 68–69].

Speaking as the internal affairs commander, Capt. Green testified that RR investigations are not "disciplinary." They are not based on allegations of misconduct. The purpose of the RR report is to determine whether an officer's use

of force met policy guidelines. More often than not, there is no finding of misconduct. [R. 84, pp. 34–35]. When there is a finding of misconduct, then an IA investigation commences. IAs can also be triggered by a written complaint (such as a complaint from a citizen, a fellow trooper, or a post commander). *Id*. at 35–36. Few RRs ripen into IAs. And a small percentage IAs are based on RRs. *Id* at 39–40.

Capt. Green testified that, if a trooper refused to answer questions in an *IA* investigation, there would not be immediate discipline. Instead, the refusal to answer would likely instigate a separate Class-A obstruction investigation. [R. 84, p. 49].

Capt. Green testified that, although the written RR policy commands the supervisor to do a recorded interview, the policy does not contain a requirement that the trooper answer questions. [R. 84, pp. 36–37]. While the IA policy states that *Garrity* warnings should be given prior to an IA interview, the RR policy is silent on *Garrity* warnings. *Id*. at 39. When an RR report uncovers a policy violation, that RR report can set the stage for the subsequent IA investigation. Internal Affairs may rely entirely on the evidence collected in the RR investigation, but they can also interview the troopers on their own. Misconduct is often first unearthed in the RR process. *Id*. at 61–63. And, if an IA investigation commences, the RR report is "intimately involved" in the IA review. *Id*. at 62.

When an IA investigation results in a "substantiated" claim of misconduct, then the investigation is passed to the post commander. From there, it goes to Capt. Green. Then Capt. Green forwards it up for "command staff" review, where the Commissioner makes the final decision. The Commissioner has "complete discretion" in imposing discipline. [R. 84, pp. 51–52]. A disciplined trooper can appeal to the "administrative review board" or the "trial board," depending on the classification of the violation(s). Capt. Green said there is also the possibility in some cases to appeal a disciplinary action to the Franklin Circuit Court. *Id*. at 54. Capt. Green testified he has never heard of a trooper invoking his right to remain silent or otherwise refusing to answer questions in an RR interview. [R. 84, pp. 37, 73]. Were that to happen, Capt. Green guessed the supervisor would likely stop the interview and reach out to the legal department for guidance. Such a refusal, he said, could prompt a disciplinary or criminal investigation. If the interview were to be continued after an invocation of the right to remain silent, the investigation would probably utilize *Garrity* warnings. *Id*. at 37–39, 41, 49.

Capt. Green testified that a supervisor can summarily suspend a subordinate without pay. But this is not a "disciplinary" action, as only the Commissioner can meet out discipline. [R. 84, p. 41].

Capt. Green testified he believes "initial" RR interviews are not *Garrity*-protected. But if the investigation ripens into one where the trooper will be facing discipline, then *Garrity* warnings should be given. Nevertheless, it is not unusual for IA

investigations to rely solely on the evidence from an RR investigation, including those interviews. But Capt. Green said that RR interviews should focus on the use of force, not misconduct. He said that if a disciplinary issue arises in an RR investigation, that should result in a second interview with *Garrity* warnings. [R. 84, pp. 62–65].

Capt. Green testified that, had he been in Defendant's position during the RR interview, he would have felt compelled to answer Partin's questions. [R. 84, pp. 71, 84–85]. He said that if his phone had been taken and he was being interviewed in an interrogation room, it would feel like a criminal interview to him. He said he would feel "more compelled" to answer questions in an administrative investigation than a criminal investigation. *Id.* at 71. He was asked:

> Q: [W]ould you agree with me that there exists in KSP and existed in August 2020 a culture built around the idea that troopers had to answer questions during RNRs?

> A. I don't know that I would say a culture built around that, but I would think that's the general consensus of the agency that you are required to answer for when you use force.

*Id.* at 72.

Capt. Green testified he does not need to command officers to answer his questions because such an order is implied under KSP's chain-of-command policies. [R. 84, pp. 73–74].

Capt. Green initially testified that, other than this case, he was not aware of any RR answers being used in a criminal prosecution. [R. 84, p. 73]. On redirect, Capt. Green recalled a case in 2022 or 2023 where the RR was part of a case referred for prosecution. But the prosecutor declined to press charges in that matter. Capt. Green did not participate in that matter—the referral was done by the operations division, not internal affairs. In that matter, internal affairs conducted no interviews following the RR. *Id.* at 89–97. Capt. Green did not know if the RR materials given to the prosecutor in that matter had been redacted:

> A: . . . . If something was redacted when it was given to the prosecutor, I do not know.

> Q. So is it fair to say you have literally little clue exactly what was given to the prosecutor?

> A. Correct.

Id. at 97.[13]

Capt. Green discussed the temporary policy change that was also described by Ms. Kincer. He said that, as a result of this case, the legal department instructed him to advise new sergeants to give *Garrity* warnings prior to RR interviews. This new training took place in the "sergeant's academy," which is a one-week class. The written policy had not changed, but that single sergeant's class was instructed to "read *Garrity*" for RRs. Only the training changed (not the written policy), and only temporarily. [R. 84, pp. 74–77].

Capt. Green said this unwritten policy changed again after the Seattle matter. The DOJ had issued a report addressing the fact that the Seattle police were using *Garrity* warnings in use-of-force investigations. The DOJ encouraged them to stop and told the Seattle police that *Garrity* warnings created the appearance that they were trying to prevent criminal prosecutions of their officers. [R. 84, p. 97]. Capt. Green continued:

> I had a conversation directly with . . . Attorney Eric Daigle [who] gives trainings to law enforcement across the U.S. . . . He pointed out the Seattle thing to me. And he told me that, if we go down the road of reading *Garrity* prior to our RR investigations, we will find ourselves likely facing problems with DOJ because they are going to say that we're intentionally trying to ever prevent our officers from facing criminal charges in these situations.

*Id.* at 98.

[R. 88, pp. 45–49].

After the hearing, the parties were afforded an opportunity to file post-hearing briefs, and both parties did so. *See* [R. 80; R. 85; R. 86; R. 87]. On June 27, 2023, Magistrate Judge Ingram issued his Recommended Disposition, [R. 88], recommending that the Motion to Suppress be granted. The United States submitted objections to the Recommended Disposition, [R. 91]. Elliotte responded to these objections, [R. 95], and the United States filed a reply, [R. 96]. This matter is therefore fully briefed and ripe for review.

---

[13] Here, the Magistrate Judge explained, "The government's statement that 'Captain Green testified that an RR investigation was provided to state prosecutors just within the last year' [R. 86, p. 24] does not tell the whole story. Capt. Green had no personal knowledge of that file and did not know whether the RR report had been redacted like the report supplied by Ms. Kincer in this case." [R. 88, p. 48 n.9].

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(B), a district court judge may designate a Magistrate Judge to conduct evidentiary hearings and submit proposed findings of fact and recommendations for the disposition of certain motions, including motions to suppress evidence. Within fourteen days of being served a copy of that recommended disposition, any party may file written objections to the Magistrate Judge's proposed findings and recommendation. 28 U.S.C. § 636(b)(1). This Court must then "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; *see also Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). A specific objection, which preserves the issue for appeal, "explain[s] and cite[s] specific portions of the report which [counsel] deem[s] problematic." *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 1997) (quoting *Smith v. Chater*, 121 F.3d 709, 1997 WL 415309, *2 (6th Cir. 1997)) (internal quotation marks omitted). Courts need not conduct de novo review of general objections that fail to identify specific factual or legal issues, because it duplicates the Magistrate Judge's efforts and wastes judicial economy. *Howard v. Sec. of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Ultimately, a district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## III. ANALYSIS

### A. The Fifth Amendment and its Prophylactic Rules

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. This right against self-incrimination has been described as a "fundamental trial right of criminal defendants." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990).

However, "the Supreme Court has interpreted the clause as barring the government from engaging in certain pretrial conduct" as well, "such as compelling a person to make incriminating statements (absent a grant of immunity) or punishing a person who refuses to make such statements." *Chavez v. Robinson*, 12 F.4th 978, 985 (9th Cir. 2021) (citing *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977)). Thus, when an individual is questioned by the government and "a truthful answer might incriminate him in a future criminal proceeding," the Fifth Amendment's Self-Incrimination Clause "provides him with the *privilege* to refuse to answer." *United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1022 (D. Or. 2014) (citing *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). Typically, however, if the individual does not assert that privilege at the time of questioning—in other words, he simply answers the question—"his answer is considered voluntary (that is, not 'compelled') for purposes of the Fifth Amendment." *Goodpaster*, 65 F. Supp. 3d at 1022 (citing *Minnesota v. Murphy*, 465 U.S. 420, 429 (1984)).

This general rule is not without exceptions. *Id*. "For certain 'well-defined situations' that are sufficiently likely to entail coercion, the Supreme Court has 'created prophylactic rules designed to safeguard the core constitutional rights protected by the Self-Incrimination Clause.'" *Id.* (quoting *Chavez v. Martinez*, 538 U.S. 760, 770 (2003)). As other courts have explained, a prophylactic rule does not ask "whether statements were *actually* compelled." *Id.* at 1022–23 (citing *Oregon v. Elstad*, 470 U.S. 298, 307 (1985)). Instead, a prophylactic rule "asks whether certain *other* conditions were met and provides that statements made under those conditions are deemed *per se* compelled." *Id.* at 1023 (citing *Elstad*, 470 U.S. at 307); *see also Murphy*, 465 U.S. at 434 ("The general rule that the privilege must be claimed when self-incrimination is threatened has also been deemed inapplicable in cases where the assertion of the privilege is

penalized so as to 'foreclos[e] a free choice to remain silent, and . . . compe[l] . . . incriminating testimony.'" (quoting *Garner v. United States*, 424 U.S. 648, 661 (1976))).

One such prophylactic rule is the well-known rule articulated by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966). *See Goodpaster*, 65 F. Supp. 3d at 1023. In that case, the Supreme Court recognized "that custody contains 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Id.* (quoting *Miranda*, 384 U.S. at 467). "To offset this coercion, *Miranda* mandated that certain warnings be given before a suspect in custody is interrogated." *Id.* (citing *Miranda*, 384 U.S. at 478–79). Without these *Miranda* warnings, "a suspect's statements made during custodial interrogation—even 'patently *voluntary* statements'—may not be used against him in the prosecution's case-in-chief." *Id.* (citing *Elstad*, 470 U.S. at 307; *Miranda*, 384 U.S. at 478–79).

The *Miranda* rule is not the only prophylactic rule, however, *id.* at 1024, and it is not the rule at issue in the present case. Instead, Elliotte's suppression motion focuses on a less-well-known rule, first articulated in *Garrity v. New Jersey*, 385 U.S. 493 (1967). *See, e.g.*, [R. 55]. In that case, the Supreme Court "delineated a prophylactic rule parallel to that of *Miranda*: The government may not threaten substantially to penalize a person for asserting his Fifth Amendment privilege." *Goodpaster*, 65 F. Supp. 3d at 1024 (citing *Murphy*, 465 U.S. at 434; *Garrity*, 385 U.S. at 493–98); *see also Chavez v. Martinez*, 538 U.S. 760, 768 n.2 (describing the *Garrity* rule, as developed in subsequent Supreme Court case law, as "a prophylactic rule we have construed to protect the Fifth Amendment's right from invasion"). Thus, where the government has made such threats, it has "created a 'classic penalty situation,' and any answers

given by the suspect are 'deemed compelled and inadmissible in a criminal prosecution.'"

*Goodpaster*, 65 F. Supp. 3d at 1024 (quoting *Murphy*, 465 U.S. at 435).

Relying on *Garrity*, Elliotte seeks to prevent the United States from using certain allegedly compelled statements at his trial in this case. As previously explained, Elliotte seeks to suppress all statements made to KSP investigators (and specifically, his supervisor, Sergeant Partin) during the RR investigation that followed the August 18, 2020 use-of-force incident. *See generally* [R. 55; R. 85; R. 95]. To determine whether these statements were, in fact, compelled under *Garrity* and are therefore inadmissible at Elliotte's criminal trial, the Court must first undertake a detailed examination of *Garrity* and its progeny.

### B.  *Garrity* and its Progeny

#### 1.  *Garrity v. New Jersey*

*Garrity v. New Jersey* involved an investigation by the state Attorney General into the alleged fixing of traffic tickets. 385 U.S. at 494. As part of this investigation, several police officers were interviewed. *Id.* Before being questioned, each officer was warned "(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office." *Id.* The police officers answered the interviewer's questions. Over the officers' objections, some of the interview answers were used in subsequent criminal prosecutions for conspiracy to obstruct the administration of traffic laws. *Id.* at 495. The trial court determined that the statements had been given voluntarily and therefore allowed them to be used at the criminal trial. *Id.* at 495 n.2. The officers were convicted. *Id.*

The Supreme Court granted certiorari to consider whether a public employer "can use the threat of discharge to secure incriminatory evidence against an employee." *Id.* at 499. Ultimately, the Court explained, "[t]he question is whether the accused was deprived of his 'free choice to admit, to deny, or to refuse to answer.'" *Id.* at 496 (quoting *Lisenba v. People of State of California*, 314 U.S. 219, 241 (1941). Turning to the case before it, the Court explained,

> The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in *Miranda v. State of Arizona*, 384 U.S. 436, 464–465 . . . is "likely to exert such pressure upon an individual as to disable him from making a free and rational choice." We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

*Id.* at 497–98.

The Court went on to consider the argument that the officers had waived their rights by answering the interviewer's questions. *Id.* at 498. The Court explained, "Where the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other." *Id.* (quoting *Stevens v. Marks*, 383 U.S. 234, 243 (1966)). In other words, "'It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called.'" *Id.* (quoting *Union Pac. R.R. Co. v. Public Service Comm. of Missouri*, 248 U.S. 67, 70 (1918)). In other words, the officers had not waived their rights by choosing the lesser of "the rock and the whirlpool."

The Supreme Court ultimately concluded that the Fifth Amendment, as applied to the states by the Fourteenth Amendment,[14] "prohibits use in subsequent criminal proceedings of

---

[14] The Sixth Circuit has explained that "[t]his core protection against forced self-incrimination" is "binding on the federal government by virtue of the Fifth Amendment itself," but it is also "applicable to the states by virtue of the

statements obtained under threat of removal from office." *Id.* at 500. In other words, "the threat of removal from one's position constitutes coercion which renders any statements elicited thereby in criminal proceedings against the party so coerced." *Weston v. U.S. Dept. of Housing and Urban Development*, 724 F.2d 943, 948 (Fed. Cir. 1983) (citing *Garrity*, 385 U.S. at 500); *see also McKinley v. City of Mansfield*, 404 F.3d 418, 427 (6th Cir. 2005) ("As a matter of Fifth Amendment right, *Garrity* precludes use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation.").

In the years following *Garrity*, this rule has developed through both Supreme Court precedent and other cases across the circuits, as explained below.

### 2. *Garrity*'s Supreme Court Progeny

#### a. "*Garrity* Immunity"

The *Garrity* Court did not describe the government employer's investigation as providing a grant of immunity. However, post-*Garrity* decisions made clear that, when a government employer threatens to penalize an employee for refusing to answer questions, the employee is entitled to "*Garrity* immunity," thereby preventing the use of any answers in a criminal proceeding against the employee. *See, e.g.*, *Turley*, 414 U.S. at 80–82; *Gardner v. Broderick*, 392 U.S. 273, 278 (1968); *Uniform Sanitation Men Assoc., Inc. v. Comm'r of Sanitation*, 392 U.S. 280, 284–85 (1968); *see also Chavez*, 538 U.S. at 768 n.2 (referring to a public employee's immunity from the use of their compelled statements in criminal proceedings); *Goodpaster*, 65 F. Supp. 3d at 1025 (explaining *Garrity* immunity).

---

Fourteenth Amendment." *McKinley v. City of Mansfield*, 404 F.3d 418, 430 (6th Cir. 2005) (citing *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)).

However, so long as that immunity remains intact, the government employer may compel answers from the employee. *See Turley*, 414 U.S. at 325 ("Although due regard for the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use."); *Gardner*, 392 U.S. at 276 ("Answers may be compelled regardless of the [Fifth Amendment] privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connection with a criminal prosecution against the person testifying."); *Goodpaster*, 65 F. Supp. 3d at 1025 (discussing *Gardner*). And if the employee "refuses to answer questions 'relating to the performance of his official duties, without being required to waive his immunity . . . the privilege against self-incrimination [is not] a bar to his dismissal." *Goodpaster*, 65 F. Supp. 3d at 1025–26 (quoting *Gardner*, 392 U.S. at 278); *see also Turley*, 414 U.S. at 326 ("[G]iven adequate immunity, the State may plainly insist that employees either answer questions under oath about the performance of their job or suffer the loss of employment.:); *Uniform Sanitation*, 392 U.S. at 284 ("[I]f New York had demanded that petitioners answer questions specifically, directly, and narrowly relating to the performance of their official duties on pain of dismissal from public employment without requiring relinquishment of the benefits of the constitutional privilege, and if they had refused to do so," then dismissal would have been permissible.). In other words, a government employer may threaten a penalty (like termination) to compel an employee to answer questions regarding the performance of his official duties, so long as the employee's immunity remains intact. If the employee answers, his answers may not be used against him in a subsequent criminal prosecution (due to the immunity). If he remains silent, he can be disciplined by his employer.

However, the employer "may not insist that [its employees] waive their Fifth Amendment privilege against self-incrimination and consent to the use of the fruits of the interrogation in any later proceedings brought against them." *Turley*, 414 U.S. at 84–85. Instead, the government employer must recognize "that answers elicited upon the threat of the loss of employment are compelled and inadmissible in evidence," and as a result, "if answers are to be required in such circumstances [the government employer] must offer to the witness whatever immunity is required to supplant the privilege and may not insist that the employee . . . waive such immunity." *Id.* at 85. This immunity is required to strike a balance between "the imperatives of the privilege" against self-incrimination, *id.* at 81, and a public employer's legitimate interests in questioning its employees in an effort to "maintain[] the integrity of its civil service." *Id.* at 78; *see also Cunningham*, 431 U.S. at 808 (discussing the state's interests); *Goodpaster*, 65 F. Supp. 3d at 1024–26 (explaining the government's dual interests as employer and prosecutor).

Other post-*Garrity* Supreme Court decisions make clear that *Garrity* immunity is not limited to threats of discharge directed at government employees. *See Murphy*, 465 U.S. at 435 (hypothesizing that *Garrity* would apply if the state threatened a probationer with revocation in response to his invocation of his Fifth Amendment privilege); *Turley*, 414 U.S. at 83–84 (applying *Garrity* rule to architects contracting with the state, who had been threatened with loss of future state contracts); *Lefkowitz v. Cunningham*, 431 U.S. 801, 807–09 (1977) (applying *Garrity* rule to public official who had been threatened with divestment of his office and a five-year ban on holding any public or party office). In these cases, the Supreme Court has "held that loss of job, loss of state contracts, loss of future contracting privileges with the state, loss of political office, loss of the right to run for political office in the future, and revocation of probation all are 'penalties' that cannot be imposed" against one exercising their Fifth

Amendment privilege. *Goodpaster*, 65 F. Supp. 3d at 1024 (quoting *United States v. Frierson*, 945 F.2d 650, 658 (3d Cir. 1991) (collecting cases)). As these cases establish, "a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." *Cunningham*, 431 U.S. at 805.

### b.  The Penalty Situation – Subjective and Objective Considerations

In other post-*Garrity* cases, the Supreme Court has made clear that, "[f]or the rule of *Garrity* to apply, the government must have created a penalty situation—it must have made some sort of threat." *See Goodpaster*, 65 F. Supp. 3d at 1026 (discussing *Murphy*). The Supreme Court first clarified this distinction in *Minnesota v. Murphy*, 465 U.S. 420 (1984). In that case, Murphy, a probationer, was required to report to his probation officer as directed and be truthful with her "in all matters." *Id.* at 422. He was informed that the failure to comply with these conditions could result in a probation revocation hearing. *Id.* At some point, the probation officer questioned Murphy about his involvement in an earlier rape and murder unrelated to the conviction for which he was on probation. *Id.* at 423–24. Murphy confessed and was ultimately indicted for first-degree murder. *Id.* at 424. He sought to suppress his statements, and the state's highest court agreed that the statements were compelled in violation of the Fifth Amendment. *Id.* at 425.

The Supreme Court reversed. *Id.* The Court explained that "[t]he threat of punishment for reliance on the [Fifth Amendment] privilege distinguishes [the *Garrity* line of cases] from the ordinary case in which a witness is merely required to appear and give testimony." *Id.* at 435. For example, "[a] state may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege." *Id.* However, "[t]he result may be different if the questions put to the probationer,

however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution." *Id.* In that case,

> if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

*Id.* Thus, the Supreme Court had to consider "whether Murphy's probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went farther and required him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." *Id.* at 436.

The Court ultimately concluded that the state had *not* created a penalty situation. To reach this conclusion, the Court considered both subjective and objective points: "a subjective inquiry into Murphy's state of mind, and an objective inquiry into a reasonable understanding of the probation conditions." *Goodpaster*, 65 F. Supp. 3d at 1027 (citing *Murphy*, 465 U.S. at 437); *see also Murphy*, 465 U.S. at 437–39. With respect to the subjective inquiry, the Court considered the lack of direct evidence that Murphy had confessed out of a fear that his probation would be revoked if he kept silent; the fact that he had not been expressly informed during the meeting that he would be penalized for refusing to answer; and the fact that he had denied committing the crime for which he had been convicted before admitting to the murder, thereby "belying the contention that those same conditions compelled him to confess." *Goodpaster*, 65 F. Supp. 3d at 1027 (summarizing *Murphy*); *see also Murphy*, 465 U.S. at 437–38. Turning to the objective inquiry, the Court noted that Murphy's conditions required him to be truthful, but he was not actually required to answer all questions; the state acknowledged that it would not and could not seek revocation for a probationer's refusal to answer incriminating questions; and

Murphy's probation could only be revoked after a hearing in which his conduct would be weighed against other factors. *Goodpaster*, 65 F. Supp. 3d at 1027 (summarizing *Murphy*); *see also Murphy*, 465 U.S. at 438–39. Further, the Court noted that it had "not been advised of any case in which Minnesota had attempted to revoke probation merely became a probationer refused to make nonimmunized disclosures concerning his own criminal conduct." *Murphy*, 465 U.S. at 439.

Thus, the *Murphy* Court held that, under either a subjective or objective test, "there is no reasonable basis for concluding that Minnesota attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Id.* at 437. Importantly, however, the Court did not express which inquiry—objective or subjective—should be used in future cases, nor did it hold that both elements were necessary. *See id.*; *Goodpaster*, 65 F. Supp. 3d at 1027 n.11.

### 3. *Garrity* in Other Circuits

In the years following *Garrity*, both federal and state courts have reached different conclusions as to how the rule should be applied. *See, e.g.*, *People v. Haleas*, 937 N.E.2d 327, 332 (Ill. App. Ct. 2010) (discussing two different approaches). The first line of authority appears to stem from a pre-*Murphy* case out of the First Circuit, *United States v. Indorato*, 628 F.2d 711 (1st Cir. 1980). In that case and those following it, courts have held that *Garrity* applies when "(1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment (or a similarly severe sanction imposed in the case of private citizens); and (2) there is a statute or municipal ordinance mandating such procedure." *Id.* at 716; *see also Haleas*, 937 N.E.2d at 332–33 (discussing *Indorato* line of cases); *State v. Aiken*, 636 S.E.2d 156, 158 (Ga. Ct. App. 2006)

(same); *State v. Stinson*, 536 S.E.2d 293, 295–96 (Ga. Ct. App. 2000) (same). Thus, this line of cases appears to require an *explicit* threat and a *mandatory* penalty.

A second line of cases[15] has evolved from *United States v. Friedrick*, 842 F.2d. 382, 673 (D.C. Cir. 1988). Unlike the *Indorato* line of cases, this post-*Murphy* line of authority "holds that *Garrity* immunity will be applied in situations where the officer has a subjective belief that he will be fired for refusing to answer questions and that belief is objectively reasonable under the circumstances." *Haleas*, 937 N.E.2d at 333 (citations omitted);[16] *see also Aiken*, 636 S.E.2d at 158 (discussing *Friedrick* line of cases); *Stinson*, 536 S.E.2d at 296 (same). Thus, courts following *Friedrick* have held that the threat of termination may be implied, rather than explicit. *See Haleas*, 937 N.E.2d at 333 (discussing *Friedrick* line of cases); *State v. Graham*, 991 N.E.2d 1116, 1122 (Ohio 2013) (explaining that, "[i]n the absence of an express threat," some jurisdictions apply the subjective-objective test outlined in *Friedrick*).

While the *Friedrick* analysis appears to be the one more in line with Supreme Court precedent,[17] this Court need not determine which line of cases—the *Indorato* line or the

---

[15] At least one state court has viewed "the analysis of *Friedrick* and *Indorato* as functionally equivalent," explaining that the First Circuit in *Indorato* "essentially concluded that the implied threat the officer subjectively believed in was not objectively reasonable without an actual, overt threat of termination for invoking the Fifth Amendment right against self-incrimination." *State v. Brockdorf*, 717 N.W.2d 657, 666–67 (Wis. 2006); *see also United States v. Wells*, 55 F.4th 784, 797 (9th Cir. 2022) (explaining, after citation to *Friedrick* and *Indorato*, that courts addressing *Garrity* "have coalesced around a similar framework" that requires both subjective and objective considerations); *United States v. Vangates*, 287 F.3d 1315, 1322 n.7 ("Effectively, . . . the First Circuit [in *Indorato*] found that the officer's subjective belief that his testimony was compelled was not objectively reasonable."); *United States v. Jianyu Huang*, No. 12-1246 WJ, 2014 WL 12789662, *7 (D.N.M. July 9, 2014) (applying subjective-objective test but relying in part on the fact that termination was not mandatory punishment). That court acknowledged, however, that cases following *Indorato* and requiring an express threat of mandatory termination "have given *Garrity* a very narrow interpretation." *Brockdorf*, 717 N.W.2d at 667 (citations omitted). Regardless of whether the *Indorato* and *Friedrick* cases present two separate tests or merely one test with diverging applications, the point remains: different jurisdictions use different approaches to determine if *Garrity* immunity applies.

[16] For this proposition, the *Haleas* case cites to *McKinley*, as well as several other cases; however, as explained below, *McKinley* does not require belief that the employee will be *terminated*. *McKinley*, 404 F.3d at 436 n.20.

[17] Notably, *Indorato* has been called into question to the extent it conflicts with the Supreme Court's analysis in *Murphy*, which was issued five years after *Indorato*. *See Goodpaster*, 65 F. Supp. 3d at 1031. Nevertheless, other post-*Murphy* cases (from other circuits) continue to rely on *Indorato*. *See, e.g.*, *Haleas*, 937 N.E.2d at 332.

*Friedrick* line—is more persuasive. Instead, the Court is bound to follow binding Supreme Court and Sixth Circuit case law. As explained below, the Sixth Circuit has adopted the *Friedrick* two-part subjective-objective test, with some modifications.[18]

### 4. *Garrity* in the Sixth Circuit

#### a.  *McKinley v. City of Mansfield*

The Sixth Circuit articulated its view of the *Garrity* rule in *McKinley v. City of Mansfield*, 404 F.3d 418 (6th Cir. 2005). In that case, the Mansfield Police Department initiated an investigation into officers' misuse of police scanners. *Id.* at 423. Over thirty police officers were interviewed, including McKinley, who was interviewed on two occasions. *Id.* Prior to the first interview, McKinley read and acknowledged a statement advising him that he was "about to be questioned as part of an official administrative investigation," and he would be asked specific questions "directly and narrowly [related] to the performance of [his] official duties or fitness as an employee or member of" the police department. *Id.* The statement further provided, "Because this is an administrative and not a criminal investigation, the Division of Police will not use any of the answers or information gained from the interview in any criminal proceeding against you." *Id.* Lastly, the statement advised McKinley that he was "ordered and required to fully and truthfully answer all questions asked of [him] in this interview," and his failure to do so meant he was in violation of the department's rules and regulations. *Id.* McKinley added to the statement that he was speaking "by reason of an order from a superior officer, advising [him] that refusal to

---

[18] Some courts have viewed *McKinley* as a rejection of the *Friedrick* approach. *See United States v. Hutley*, No. 1:10-CR-127-MHS/AJB, 2010 WL 4223741, at *10, n.3 (N.D. Ga. Aug. 27, 2010). However, *McKinley* does not expressly reject *Friedrick* and instead applies the same subjective-objective test, with one caveat: the Sixth Circuit does not require a threat of job termination and instead allows a threat of a "substantial penalty" to suffice. *McKinley*, 404 F.3d at 436 n.20. For this reason, at least one court has viewed *McKinley* as presenting a third line of authority that takes *Friedrick* "a half-step further." *United States v. Wendt*, 4:22-cr-00199-SHL-HCA, 2023 WL 4248754, *5 (S.D. Iowa June 9, 2023).

obey could result in disciplinary action," but he understood that his statement was "solely and exclusively for internal administrative purposes." *Id.*

In that first interview, McKinley denied wrongdoing. *Id.* at 424. However, the investigating officers later became aware of inconsistencies between McKinley's statement and those of other officers. *Id.* A second interview followed. *Id.* That interview consisted of an unrecorded pre-interview session, in which the investigating officers advised McKinley that they suspected him of lying in his first interview. *Id.* They did not restate the written warnings from the first interview, but they advised McKinley that he was "still under *Garrity*," so "if he said things that incriminated himself . . . those could not be used against him [criminally]." *Id.* During this second interview, McKinley admitted wrongdoing.

As a result of his interview statements, McKinley was convicted of state law charges of falsification and obstruction of official business. *Id.* The state appellate court overturned the conviction, however. *Id.* at 426. McKinley then brought suit under 42 U.S.C. § 1983 and state law. *Id.* Relevant here, McKinley argued that he had been compelled in the second interview to make incriminating statements as to falsification and obstruction, in violation of his Fifth Amendment rights. *Id.* The district court ultimately granted summary judgment in favor of the defendants, and McKinley appealed. *Id.*

On appeal, McKinley did not challenge the use of the statements from his first interview (when he was interviewed regarding misuse of the police scanners), as he "accept[ed] the general rule that the Fifth Amendment permits the government to use compelled statements obtained during an investigation if the use is limited to a prosecution for collateral crimes such as perjury or obstruction of justice." *Id.* at 427 (citations omitted). But by the second interview, he argued, these were no longer collateral crimes, as he was suspected of committing falsification and

- 40 -

obstruction, and he was then compelled by threat of disciplinary action to inculpate himself in the commission of *those* crimes. *See id.* at 431–32.

The Sixth Circuit agreed and found this to be "a classic violation of the Fifth Amendment," namely, "a decision by internal affairs officers to compel an officer suspected of specific crimes to incriminate himself as to *those* crimes, followed by the subsequent use of the incriminating statements in a trial for *those* crimes." *Id.* at 435.  "Indeed," the Court explained, "if McKinley reasonably believed that Defendants would impose substantial penalties on him— such as job loss or disciplinary sanctions—if he refused to answer the questions put to him in the second interview, he was compelled to incriminate himself in violation of the Fifth Amendment." *Id.* at 436 (citing *Cunningham*, 431 U.S. at 805–06). The Court found that McKinley has presented sufficient evidence to survive summary judgment on "the questions [of] whether any of the defendants suspected him of committing falsification and obstruction and whether any of the defendants compelled him to incriminate himself as to those crimes."[19] *Id.*

On this point, the Sixth Circuit referred in a footnote to the *Friedrick* subjective-objective test. *Id.* at 436 n.20. As previously noted, that test requires that an officer claiming *Garrity* protections "must have in fact believed [his] statements to be compelled on threat of loss of job and this belief must have been objectively reasonable." *Id.* (quoting *Friedrick*, 842 F.2d at 395) (internal quotation marks omitted).  However, the *McKinley* Court

> decline[d] to require proof that McKinley reasonably believed he would be fired. It is sufficient, we think, for a jury to conclude that he reasonably believed that substantial penalties were likely to result from his refusal to answer questions during the second interview; although job termination is surely a "substantial penalty," so, too, are other employer actions, such as ordering a demotion or suspension.

---

[19] The Sixth Circuit went on to address other issues not relevant here, such as whether issue preclusion applied, whether the police officers who took McKinley's statements were appropriate defendants, whether the right at issue was clearly established at the time of McKinley's interviews, and whether the district court had properly dismissed McKinley's malicious prosecution claims, among other things. *See McKinley*, 404 F.3d at 428–46.

*Id.* (citation omitted). The Court further explained that, to determine whether McKinley's subjective beliefs were reasonable, it must consider "the totality of the circumstances surrounding the second interview and the circumstances of the first interview, to the extent they are probative of McKinley's state of mind, and whether that state of mind was reasonable, during the second." *Id.*

Thus, to summarize the test articulated in *McKinley*: the employee must have a subjective belief that "substantial penalties were likely to result from his refusal to answer questions," and that belief must be objectively reasonable based on the totality of the circumstances. *Id.*

### b.  Post-*McKinley* Case Law

Few post-*McKinley* cases out of the Sixth Circuit actually utilize the subjective-objective test, however, as most of those cases address other *Garrity*-related questions, often in the context of a civil § 1983 claim. *See Haddad v. Gregg*, 910 F.3d 237 (6th Cir. 2018) (recognizing that a plaintiff suffers the requisite constitutional injury for purposes of a § 1983 claim only once the compelled statements are used in a criminal proceeding); *Moody v. Michigan Gaming Control Bd.* ("*Moody II*"), 871 F.3d 420 (6th Cir. 2017) (explaining that the right identified in *Moody I* was clearly established at the time of the alleged violation); *Moody v. Michigan Gaming Control Bd.* ("*Moody I*"), 790 F.3d 669 (6th Cir. 2015) (finding *McKinley* to be inapplicable where plaintiffs asserted their Fifth Amendment rights and refused to answer questions, and were not offered immunity and were instead penalized); *Arsan v. Keller*, 2018 WL 635894 (S.D. Ohio 2018) (finding that the plaintiff failed to state a § 1983 claim for violation of the Fifth Amendment where her statements were never used in a criminal proceeding); *Lindsly v. Worley*, No. 1:09-cv-375, 2012 WL 12986674 (S.D. Ohio June 19, 2012) (explaining that *Garrity* "does

not apply unless the officer's statements are used against him in a criminal case," so use of statements at a civil trial was permissible).

To add to the confusion, the Sixth Circuit has issued an unpublished decision completely ignoring the *McKinley* subjective-objective test, and requiring that the penalty at issue be automatic, seemingly following the *Indorato* line of authority. *In re Justice*, No. 20-5479, 2021 WL 3808965, at *8 (6th Cir. Aug. 26, 2021). To the extent the United States relies on this case, the Court notes that it is unpublished and therefore nonbinding, while *McKinley*, a published decision, remains good law and is binding on this Court. *See Brumbach v. United States*, 929 F.3d 791, 795 (6th Cir. 2019) (explaining that a prior published decision can only be overruled by an "inconsistent decision" of the Supreme Court or a decision of the en banc court). Further, it does not appear that any other court has relied on *In re Justice*.

Having thoroughly reviewed the *Garrity* rule and its development in this and other circuits, the Court now turns to the case at hand.

### C.  Application of the *Garrity* Rule in the Current Case

In considering *Garrity*'s application in the present case, the Court focuses on the specific circumstances presented: a government employer questioning a public employee, a police officer, about his use of force against an arrestee, pursuant to the employer's policies and without any express threat, *Garrity* warning, or Fifth Amendment waiver, and the government's use of the officer's statements in the present prosecution, which charges both civil rights violations and obstruction of justice.

Elliotte argues in his suppression motion that his statements are subject to *Garrity*, and the Magistrate Judge agreed. *See, e.g.*, [R. 55; R. 88]. In its objections, the United States challenges the Magistrate Judge's Recommended Disposition for several reasons. The Court has

distilled those objections into five main points: (1) Elliotte was required to provide extrinsic evidence to support his testimony regarding his subjective belief; (2) Elliotte did not experience the same level of compulsion as the officers in *Garrity*; (3) the KSP policies requiring Elliotte to obey orders and answer questions did not apply in this case and were not sufficient to trigger *Garrity*, and further, Elliotte's understanding of these policies was unreasonable in light of KSP's Internal Affairs Investigation Policy and the lack of any *Garrity* warnings; (4) the threatened penalty was too speculative; and (5) the RR proceedings were routine matters not subject to *Garrity*, and Elliotte was not under investigation during those proceedings. *See* [R. 91]. The United States also argues that the Magistrate Judge misunderstood the law and facts, improperly shifted the burden of proof to the United States, created "new case law and standard from whole cloth," and took an overly broad view of *Garrity*. *See, e.g.*, *id.* at 3.

The Court addresses each of these arguments below when considering whether (1) Elliotte subjectively believed that substantial penalties were likely to result from his refusal to answer questions during the RR process and (2) whether that belief was objectively reasonable.

### 1. Subjective Element

As a threshold matter, various courts have concluded that the defendant-employee "bears the burden of proving for *Garrity* purposes that he was 'compelled' to make statements by his government employer." *United States v. Wendt*, No. 4:22-cr-00199-SHL-HCA, 2023 WL 4248754, *5 (S.D. Iowa June 9, 2023) (citing *United States v. Moten*, 551 F.3d 763, 766 (8th Cir. 2008); *United States v. Burge*, No. 08 CR 846, 2009 WL 2972915, *3 (N.D. Ill. Sept. 11, 2009)); *see also United States v. Dellinger*, No. CR-13-00065-PHX-DGC, 2013 WL 4177400, *1 (D. Ariz. Aug. 15, 2013) (collecting cases). With this in mind, the Court turns to the subjective element and the United States' objections. Specifically, the United States argues that the

subjective element must fail because Elliotte did not provide extrinsic evidence to support his testimony, and further, Elliotte did not face the same level of compulsion as the officers in *Garrity*. *See* [R. 91, pp. 4–12]. The Court considers these issues below.

### a. Is extrinsic evidence required to prove the employee's subjective belief?

The United States takes issue with the Recommended Disposition because, the United States claims, it fails to cite to any evidence beyond Elliotte's own testimony that demonstrates Elliotte's belief that he would likely face substantial penalties for failure to cooperate in the RR process. [R. 91, p. 8]. "[B]y accepting the Defendant's statements at face value and requiring no additional proof," the United States argues, "the [Recommended Disposition] upends the legal standard by effectively eviscerating one of two prongs of the legal test." *Id.* Instead, the United States insists that Elliotte was required to provide "more than mere recitation of his motion's allegations." *Id.* Otherwise, "[i]f all it takes to prove this prong of the legal test is to recite those allegations repeatedly, then every single defendant will satisfy this burden simply by opening his mouth." *Id.* at 9.

For support, the United States cites to several cases. *Id.* In these cases, the United States argues, courts "have held that there needs to be additional evidence in order to meet this burden." *Id.* (citing *Wendt*, 2023 WL 4248754, at *8; *United States v. Jianyu Huang*, No. CR 12-1246 WJ, 2014 WL 12789662, at *8–9 (D.N.M. July 9, 2014); *Dellinger*, 2013 WL 4177400, at *1–4; *United State v. Cook*, 526 F. Supp. 2d 1, 4–7 (D.D.C. 2007)). The Court has thoroughly reviewed these cases, however, and can find no such holding. Instead, these courts looked at the full breadth of the evidence before them and concluded that certain evidence cut against the defendants' testimony. *See Wendt*, 2023 WL 4248754, at *7–8 (finding that certain statements were not compelled after considering various factors, including that the statements were made in

a casual and not inherently coercive atmosphere, no one told the defendant he would be fired if he refused to answer, he was not denied counsel, placed under surveillance, or told to answer questions, and the evidence demonstrated that he answered questions voluntarily because he wanted his side of the story to be told); *Jianyu Huang*, 2014 WL 12789662, at *8–9 (finding claim of subjective belief not credible because the defendant's testimony was inconsistent, the handbook he relied upon "undermine[d] [his] claim of a subjective belief" because it said only "up to and including termination," he had voluntarily given the same statement at an earlier time, and had freely discussed the matter with coworkers and in emails); *Dellinger*, 2013 WL 4177400, at *3 (finding the defendants had "presented little evidence that they subjectively believed they would be fired if they refused to" complete reports, as they had only testified that they might be "written up" or face "severe discipline," and neither testified that they had been threatened with discharge or knew of other employees that had faced discharge for failing to file reports, and instead, their testimony "amount[ed] to little more than speculation that they would have been fired for failure to prepare their reports"); *Cook*, 526 F. Supp. 2d at 7 (finding defendant's subjective belief to be "dubious" and "implausible" where he was unfamiliar with the policy that he relied upon to explain his belief, he did not know of anyone else who had been terminated under similar circumstances, and he did not object to questioning, refuse to answer questions, or request counsel). At most, these cases stand for the proposition that the Court should consider the totality of the circumstances in evaluating the subjective component, something the Sixth Circuit has also emphasized. *See McKinley*, 404 F.3d at 436 n.20. These cases do not, however, hold that a defendant *must* present extrinsic evidence to meet his burden of demonstrating his subjective belief.

To the extent that the United States relies on these cases and argues that certain evidence cuts against Elliotte's testimony as to his subjective belief, the Court addresses those arguments below. Before doing so, the Court considers the United States' argument that Elliotte did not face the same level of compulsion as the officers in *Garrity*. *See* [R. 91, p. 4].

### b. What level of compulsion is required (i.e., what kind of pressure must the employee experience)?

As noted above, the United States objects to the Magistrate Judge's recommendation because, it argues, Elliotte did not face the compulsion required by *Garrity*. [R. 91, p. 4]. Specifically, the United States takes issue with the following analysis in the Recommended Disposition: "[I]n this case, Defendant testified quite plainly and repeatedly he had no fear that his RR statements to [Sergeant] Partin could be used against him in a criminal prosecution. As such, he did not subjectively feel the pressure of being 'between the rock and the whirlpool.'" [R. 88, p. 52]. The Magistrate Judge therefore concluded that "Defendant did not subjectively experience a horrifying choice about whether to answer [Sergeant] Partin's questions." *Id.* at 53. Nevertheless, the Magistrate Judge concluded that this fact alone did not end the *Garrity* analysis, as "[t]he *Garrity* immunity rule exists so that officers no longer need be placed in such an awkward position." *Id.*; *see also id.* at 7 (summarizing this principle).

The United States objects to this analysis. First, the United States points to Elliotte's testimony that he "didn't do anything wrong" and was therefore not concerned that he might incriminate himself. [R. 91, p. 4]; *see also* [R. 83, pp. 281:18 ("I didn't do anything wrong."); 282:10–11 ("I contest then and I contest now that I didn't do anything wrong.")]; [R. 84, pp. 15:6–16 (explaining that it "didn't even cross [his] mind" that his discussions with Sergeant Partin could be used against him in court); 16:18–20 ("[T]here was never a time in which I sat back and I said, man, [a]re they going to use this against me in a criminal investigation?")]. But,

the United States points out, "the Fifth Amendment protects only incriminating statements."
[R. 91, p. 4]. From this, the United States seems to argue that, if Elliotte did not believe his
statements to be incriminating, those statements cannot be protected by the Fifth Amendment or
*Garrity*. *Id.*

In considering this argument, the Court first considers what the term "incriminating"
means in the context of the Fifth Amendment. As the Supreme Court has explained, the Fifth
Amendment's privilege against self-incrimination "extends 'to answers that would in themselves
support a conviction . . . but likewise embraces those which would furnish a link in the chain of
evidence needed to prosecute the claimant.'" *Ohio v. Reiner*, 532 U.S. 17, 20 (2001) (quoting
*Hoffman v. United States*, 341 U.S. 479, 486 (1951)). Thus, for the privilege to apply, "[I]t need
only be evident from the implications of the question, in the setting in which it is asked, that a
responsive answer to the question or an explanation of why it cannot be answered might be
dangerous because injurious disclosure could result." *Id.* at 20–21 (quoting *Hoffman*, 341 U.S. at
486–87) (internal quotation marks omitted). However, the Supreme Court has also clarified that
"the privilege's protection extends only to witnesses who have 'reasonable cause to apprehend
danger from a direct answer.'" *Id.* at 21 (quoting *Hoffman*, 341 U.S. at 486). Ultimately, this is
an inquiry for the court, and "the witness' assertion does not by itself establish the risk of
incrimination." *Id.* at 21.

In the present case, the Court understands that Elliotte was questioned about the use of
force used in Hamblin's arrest, and that his responses could potentially disclose "dangerous" or
"injurious" information—i.e., information that could support an unreasonable force conviction
or, alternatively, "furnish a link in the chain of evidence needed to prosecute" Elliotte. *Reiner*,
532 U.S. at 20 (quoting *Hoffman*, 341 U.S. at 486) (internal quotation marks omitted). The

- 48 -

United States does not dispute this, but instead focuses on Elliotte's testimony that he did nothing wrong. [R. 91, p. 4]. However, the fact that Elliotte testified that his answers were truthful and he "didn't do anything wrong" is not determinative. Instead, the Supreme Court has "recognized that truthful responses of an innocent witness, as well as those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth." *Reiner*, 532 U.S. at 21 (citing *Grunewald v. United States*, 353 U.S. 391, 421–22 (1957)).

Nevertheless, the United States focuses heavily on Elliotte's testimony that he did not fear self-incrimination. [R. 91, p. 4]. But the Court is unaware of any authority—and the United States cites none—indicating that there must be affirmative proof of the defendant's *fear of self-incrimination*. Instead, as the Court has already explained, *Garrity* announced a prophylactic rule. *See supra* Section III(A). As such, *Garrity* does not ask "whether statements were *actually* compelled." *Goodpaster*, 65 F. Supp. 3d at 1022–23 (citing *Elstad*, 470 U.S. at 307). Instead, a prophylactic rule "asks whether certain *other* conditions were met and provides that statements made under those conditions are deemed *per se* compelled." *Id.* at 1023 (citing *Elstad*, 470 U.S. at 307); *see also Murphy*, 465 U.S. at 434 ("The general rule that the privilege must be claimed when self-incrimination is threatened has also been deemed inapplicable in cases where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and . . . compe[l] . . . incriminating testimony.'" (quoting *Garner v. United States*, 424 U.S. 648, 661 (1976)). The "certain other conditions" include (1) a subjective belief that the defendant was likely to face substantial penalties if he refused to answer questions and (2) that belief was objectively reasonable. *McKinley*, 404 F.3d at 436 n.20. There is no requirement that Elliotte subjectively believed his answers were incriminating or were likely to be used against him in a criminal prosecution.

- 49 -

Moreover, and perhaps more importantly, the Court disagrees with the United States'
characterization of Elliotte's testimony. Elliotte did not, as the United States suggest, testify that
he lacked a fear of self-incrimination because his statements were not incriminating or because
he was innocent. Instead, Elliotte testified that he did not believe his statements could be used
against him in a criminal proceeding under *Garrity*. For example, on the second day of the
evidentiary hearing, the following exchange took place between Elliotte and the Court:

> Q. [D]o you recall what your training was about your rights under *Garrity*?
>
> A. As far as—yes, I do.
>
> Q. What do you recall about that?
>
> A. I recall that we were trained as though we had a duty to comply honestly
> with administrative investigations and that any statement given in an
> administrative investigation couldn't be used against us in a criminal
> proceeding because of *Garrity*; *Garrity* protected us—that from happening.
>
> Q. At the time of your discussions with Sergeant Partin that you have
> described today, did you have any fear that statements that you might say
> could be used against you in court?
>
> A. It didn't even cross my mind because my training had told me that it
> couldn't happen and my experience had told me that that would be
> something that wouldn't happen.
>
> Q. But you assumed you could answer his questions without those
> statements being used in a criminal prosecution; is that correct?
>
> A. Correct.

[R. 84, pp. 14:22–25, 15:1–16]. Later, he clarified, "[T]here was never a time in which I sat back
and I said, man, [a]re they going to use this against me in a criminal investigation? It was just—I
believe[d] it was just for administrative purposes and that's as far as it would go." *Id.* at 16:18–
22. In other words, Elliotte testified that he believed his statements were protected by *Garrity*,

and as a result, they could not be used against him in a future criminal proceeding—i.e., they could not be used to incriminate him.

Having clarified Elliotte's testimony and the meaning of "incriminating," the Court turns to the remainder of the United States' argument. The United States argues that the Magistrate Judge "posits a new legal standard" in making the following statement: "[F]or a statement to be compelled under *Garrity*, it is not necessary that the interviewee subjectively experience the same pressure as the officers in *Garrity*." [R. 91, p. 5]; *see also* [R. 88, p. 16]. The United States also points to the statement that "the interviewee does not have to prove she felt she had to make a terrible choice between losing her job on one hand and opening herself to potential criminal prosecution on the other hand." [R. 91, p. 5]; *see also* [R. 88, p. 7]. The United States notes that the Recommended Disposition does not include any citations to support these statements, while various cases require compulsion for *Garrity* to apply. [R. 91, pp. 5–7].

From the best the Court can tell, the United States has taken the above-cited statements in the Recommended Disposition and broadly read them to eliminate the requirement of coercion. The Court disagrees with the United States' characterization of these statements, however. Instead, the Court understands that the Magistrate Judge was simply explaining the purpose of *Garrity*—to provide immunity to public employees who are faced with a pressing choice between refusing to speak and suffering substantial employment penalties, or speaking and having their words used against them in a criminal proceeding. Because *Garrity* provides immunity to such employees, they need not worry that their statements will be used against them in a future criminal proceeding. *See generally supra* Section III(B)(2)(a) (explaining *Garrity* immunity). Thus, the Magistrate Judge was simply explaining the purpose of *Garrity*. *See* [R. 88, p. 7 ("[T]he interviewee does not have to prove she felt she had to make a terrible choice

between losing her job on one hand and opening herself to potential criminal prosecution on the other hand. This is because the point of *Garrity* immunity is to dissolve this dilemma.")].

To be clear, the Court does not disagree with the United States' contention that compulsion is necessary for *Garrity* to apply. But to the extent the United States suggests that the Magistrate Judge ruled otherwise, the Court disagrees. In fact, in other portions of the Recommended Disposition, the Magistrate Judge emphasizes the necessity of compulsion. *See, e.g.*, *id.* at 14 ("[T]here is no essential element in a *Garrity* claim requiring that the Fifth-Amendment privilege be specifically targeted in the relevant statute or policy. What matters is compulsion to speak under threat of substantial employment consequences."); *id.* at 14–15 ("Although the Supreme Court has not recently revisited the *Garrity* line of cases, a number of the circuits have focused on the 'coercion' issue emphasized by the Court in those cases, making it a claim dependent on such a showing." (quoting *Cook*, 526 F. Supp. 2d at 6) (internal quotation marks omitted)). And in many of the cases cited in the Recommended Disposition (and discussed in the parties' briefing and below), the courts also stress the necessity of compulsion. *See, e.g.*, *United States v. Wells*, 55 F.4th 784, 732–93 (9th Cir. 2022); *United States v. Trevino*, 215 F. App'x 319, 321 (5th Cir. 2007); *Cook*, 526 F. Supp. 2d at 6–7.

As those courts explain, "To make out a *Garrity* claim, the officer must demonstrate that he had been put 'between the rock and the whirlpool,' *Garrity*, 385 U.S. at 498 . . . , by having to choose whether to incriminate himself or to lose his job." *Cook*, 526 F. Supp. 2d at 6–7. To make this showing in the Sixth Circuit, the employee must have held a subjective belief that "substantial penalties were likely to result from his refusal to answer questions," and that belief must have been objectively reasonable based on the totality of the circumstances. *McKinley*, 404 F.3d at 436 n.20.

Having addressed some of the United States' initial concerns about the subjective component, the Court now considers the totality of the circumstances and the evidence of record to determine if Elliotte subjectively believed that he was likely to face substantial penalties if he did not response to Sergeant Partin.

### c.  Did Elliotte satisfy his burden of demonstrating a subjective belief that he was likely to be penalized if he did not answer Sergeant Partin's questions?

In considering the subjective component of Elliotte's *Garrity* claim, the Court is mindful of other courts' analyses on this issue. For example, in *United States v. Jianyu Huang*, No. CR 12-1246 WJ, 2014 WL 12789662, (D.N.M. July 9, 2014), the district court found that the defendant's claim of a subjective belief was not credible. *Id.* at *8. In reaching this conclusion, the court noted that the defendant's testimony "was sufficiently inconsistent as to weaken its integrity"; the employee handbook that he relied on stated only that failure to participate in an investigation could result in disciplinary action "up to and including termination";[20] he had previously given his statement voluntarily to others; and he had freely discussed the matter with other coworkers and in emails and voicemails, voluntarily and without solicitation. *Id.* at *8–9.

Similarly, in *United States v. Cook*, 526 F. Supp. 2d 1 (D.D.C. 2007), the district court found the defendant's claimed subjective belief that he would be terminated for failing to file certain use-of-force reports to be "at best, dubious." *Id.* at 7. In that case, the officer cited to his employer's policy setting out the disciplinary consequences for failing to file the reports. *Id.* However, he admitted that he was unfamiliar with the policy, and further, he was not aware of anyone that had been terminated for failing to file a use-of-force report. *Id.* In fact, "[t]he only

---

[20] The district court also noted that there was no evidence that termination was mandatory or automatic, apparently relying on the *Indorato* line of cases, but meanwhile applying the subjective-objective test. *Jianyu Huang*, 2014 WL 12789662, *7–8.

evidence he offered to support his belief that refusal to submit a report would be punished by termination was that another deputy claimed to have been told that he would be fired if he refused to submit a report." *Id.* But the officer could not recall if he was aware of this information at the time he filled out his own report, and he also was unfamiliar with that deputy's situation. *Id.* Further, when he was told to write the use-of-force report, Cook "did not object, refuse, or request representation." *Id.* "Under these circumstances," the district court concluded, "Cook's contention that he was coerced into making the report for fear of being fired is implausible." *Id.*

The district court in *United States v. Dellinger*, No. CR-13-00065-PHX-DGC, 2013 WL 4177400 (D. Ariz. Aug. 15, 2013) relied on *Cook* in concluding that the defendants "failed to show that they subjectively believed they would be terminated if they failed to complete" certain reports. *Id.* at *4. On this point, the court noted that the defendants testified that they would probably be "written up" or face "severe discipline," but neither defendant was ever threatened with discharge or knew of other employees that had been discharged for failing to complete reports. *Id.* at *3. Thus, the court found that the defendants' "evidence amounts to little more than speculation that they would have been fired for failure to prepare their reports." *Id.* The court also noted that both defendants knew that they would be required to fill out the reports, both had received training on how to do so, and both had written such reports previously. *Id.* And one defendant began to draft his report, even before his supervisor instructed him to do so. *Id.* As a result of these various factors, the district court found that the defendants failed to satisfy the subjective element of their *Garrity* claim.

In a more recent case, the Ninth Circuit found the subjective component lacking where the defendant never expressed any such belief to the Court, was unfamiliar with the policy he

relied upon, and appeared to cooperate "in an apparent effort to make it seem that he had nothing to hide." *Wells*, 55 F.4th at 798–99. In that case, *United States v. Wells*, the court also noted that "the interviews were friendly and nonconfrontational," the defendant "never expressed concern [during any of his six interviews] that his employment would be affected if he did not participate," and he "readily agreed to" certain inquires that he was told to be voluntary. *Id.*; *see also Wendt*, 2023 WL 4248754, *7 ("No one told Wendt on that date that he would be fired unless he answered questions, nor did he present evidence of a coercive atmosphere such as being put in an interview room, denied access to counsel, placed under surveillance, or 'directed' to respond to questions.").

Having reviewed this case law and the evidence of record, the Court finds that this case is similar in some ways to the above-cited cases. Like the defendants in those cases, Elliotte testified that he believed he could be subject to substantial discipline (namely, demotion, suspension, or termination) if he failed to respond to his interviewer's questions. *See, e.g.*, [R. 83, pp. 207:11–13; 211:6–14; 213:2–24. 221:8–9]; [R. 84, p. 14:3–5].  Specifically, he testified that he believed he was required by KSP policies to fully cooperate in the RR interview process, and that his failure to do so would constitute insubordination or obstruction, both Class A violations. *See, e.g.*, [R. 83, pp. 207:11–13; 211:6–14; 213:2–24]; [R. 84, p. 14:3–5].  He also testified to his understanding that Class A violations could be punished by demotion, suspension, or termination. *See, e.g.*, [R. 83, p. 213:11–24]; [R. 84, p. 14:3–5].

Certain facts, however, cut against this testimony.[21] Similar to the above-cited cases, there is no evidence in this case that Elliotte was expressly informed that he needed to answer or

---

[21] To the extent the Recommended Disposition concludes that "no evidence has been presented indicating a *lack* of subjective belief on Defendant's part," [R. 88, p. 56], the Court disagrees and finds that some evidence (recited above) does cut against Elliotte's testimony on this issue. To be clear, however, the Court does not agree with the United States' contention that the Magistrate Judge improperly shifted the burden of proof to the United States. *See*

else face substantial penalties, or even that he must answer the questions; he never requested to have an attorney present; he never objected to the questioning; and he answered all questions put to him. *See Wells*, 55 F.4th at 798–99; *Cook*, 526 F. Supp. 2d 1 at 7; *Wendt*, 2023 WL 4248754, at *7; *see also* [R. 83, pp. 212:20–22; 240:3–25, 241:1–19]. Further, like the defendants in *Dellinger*, Elliotte was not accused of wrongdoing at the time he was questioned. *Dellinger*, 2013 WL 4177400, at *3. Lastly, he was not aware of anyone that had ever been disciplined for failing to answer questions in an RR process. *See Dellinger*, 2013 WL 4177400, at *3; *Cook*, 526 F. Supp. 2d 1 at 7; [R 83, p. 207:15–18].

However, this case is also distinguishable from the above-cited cases. First, unlike the defendant in *Wells*, who was questioned in a "friendly and nonconfrontational" manner, 55 F.4th at 798–99, or the defendant in *Wendt*, who was questioned in a casual, informal setting without surveillance, 2023 WL 4248754, at *7, Elliotte was questioned in a more coercive atmosphere.[22] Specifically, he was questioned one-on-one by his supervisor in an interrogation room at KSP Post 11, the same room arrestees are often interviewed in, after being ordered to do so by his supervisor. *See* [R. 83, pp. 30:9–11, 23–25, 31:1–3, 211:18–25, 241:24–25, 242:1–3, 244:5–9]. He was also told to leave his phone and smart watch in another room, and the interview was audio-recorded. *Id.* at 30:15–22; 212:6–19. In fact, Sergeant Partin testified that he considered Elliotte to be "confined" to the interrogation room during the RR interview, though he did not represent to Elliotte that he was or was not free to leave.[23] *Id.* at 31:12–25. Even the United

---

[R. 91, p. 10]. Instead, the Magistrate Judge's statement merely indicates that the Magistrate Judge was considering the totality of the circumstances and the evidence before the Court.

[22] Much of the Court's analysis concentrates on the August 20, 2020 RR interview. The Court discusses and distinguishes the initial August 18, 2020 call and the August 18, 2020 questioning at the hospital below. *See infra* Section III(C)(2)(c).

[23] The Court expresses no opinion as to whether Elliotte was in custody at the time of the RR interview.

States' own witness, Captain Green, testified that, under similar circumstances, he would have felt "more compelled" to answer questions. [R. 84, p. 71:11–25]. And unlike the defendant in *Jianyu Huang*, Elliotte's testimony about his subjective belief was consistent, and there is no evidence suggesting that he causally discussed the same matters in emails or with coworkers (who were not his superiors). *See Jianyu Huang*, 2014 WL 12789662, at *8–9. Lastly, unlike the defendant in *Cook*, Elliotte testified that he was familiar with the KSP policies he relies on and had been involved in approximately twenty to twenty-five other RR investigations. *See Cook*, 526 F. Supp. 2d 1 at 7; [R. 83 206:1–19 (testifying as to his familiarity with the RR Policy and prior RR investigations)]. These facts lend credibility to Elliotte's testimony that he believed he would likely face substantial penalties if he did not cooperate in the RR process.

Another distinguishing circumstance in the present case is Elliotte's testimony that he believed—at the time of the RR interview—that his statements were *Garrity* protected and could not later be used against him in a criminal proceeding. *See, e.g.*, [R. 83, p. 245:14–23]. Given Elliotte's testimony that he understood at the time of his interview that his statements were *Garrity* protected—or, in other words, that he retained his *Garrity* immunity—the Court affords little weight to the fact that he was not expressly told that he had to answer the questions, he never requested an attorney or objected to the questions, and he answered all questions put to him. Stated another way, Elliotte had no reason to request an attorney or to object to questioning because (right or wrong) he understood that his statements could not be used against him later in a criminal action. *See, e.g.*, [R. 83, pp. 245:14–25, 246:1–1 (explaining that he felt it was lawful for Sergeant Partin to force him to answer questions and use his answers for administrative purposes, and the situation only became unlawful when his statements were used against him in a criminal proceeding). This also explains why Elliotte expressed no concern that his Fifth

Amendment rights had been violated until after the criminal investigation began. *See, e.g.*, [R. 84, p. 24:3–13].

The Court also acknowledges the United States' argument that Elliotte was aware of the KSP Internal Affairs Policy, which explains that officers under an Internal Affairs investigation are required to answer questions during an interview, but their statements are subject to *Garrity* protection, and they should be read *Garrity* warnings. *See* [R. 59-6, pp. 2–3 (Internal Affairs Policy)]; [R. 83, pp. 205:12–25 (testifying as to his familiarity with KSP policies generally)]. On the other hand, the RR Policy, which Elliotte also testified to being familiar with, contained no such *Garrity* discussion. *See* [R. 59-5 (RR Policy)]; [R. 83 206:1–19 (testifying as to his familiarity with the RR Policy)]. From this, the United States argues, it is not plausible that Elliotte believed that the RR procedures were *Garrity* protected.[24]  *See* [R. 91, p. 11 ("[T]he Defendant's claimed subjective belief (that if he invoked the Fifth Amendment, he would be disciplined for it) is further belied by the fact that KSP's clearly established method for compelling a statement was never referenced or put into action," referring to the Internal Affairs Policy.)].

This is a strained interpretation of the evidence, however. First, Elliotte testified that he was familiar with KSP policies in general, [R. 83, pp. 205:12–25], and the RR Policy specifically, *id.* at 206:1–19. In fact, he had been involved in roughly twenty to twenty-five RR investigations. *Id.* at 206:10–13. However, he did not testify that he was intimately familiar with the Internal Affairs Policy specifically, and he explained in his testimony that he had never been

---

[24] The Court notes that other defense witnesses—including KSP's General Counsel—testified that they, too, believed that statements made during an RR interview were protected under *Garrity*. [R. 83, pp. 129:5–21, 170:4–20]. Ultimately, this is for the Court to decide. And while this testimony may not bear directly on the subjective component, it adds context to the reasonableness of Elliotte's subjective belief, as discussed in more detail below. *See infra* Section III(C)(2)(a).

personally involved as a target of a formal Internal Affairs investigation (as of August 20, 2020), and he was not aware at that time what warnings were given during such investigations. [R. 84, pp. 214:19–25, 215:1–4]. And even if Elliotte had been intimately familiar with the Internal Affairs Policy, the Court finds little merit in the United States' argument. The Internal Affairs Policy directs that an officer should be given *Garrity* warnings prior to an internal affairs interview, but it does not state nor suggest that an internal affairs interview is the *only* process that might trigger *Garrity*. *See* [R. 59-6, pp. 2–3]. And in fact, some of the circumstances recited in the Internal Affairs Policy's *Garrity* discussion also existed within the context of Elliotte's RR interview. For example, the Internal Affairs Policy explains that the interview must be given at a KSP facility (like Elliotte's RR interview), and the interview must be audio or video recorded (like Elliotte's RR interview). Indeed, Elliotte testified to his belief that RR procedures and Internal Affairs investigations were both "a form of administrative internal investigation." [R. 83, p. 215:11–18]. Thus, it is certainly not unreasonable or implausible for Elliotte to be familiar with these various policies and also believe that the RR interview was *Garrity*-protected. This seems especially true in light of the formal and coercive nature of the RR interview (i.e., audio-recorded in an interrogation room, with phone and smart watch removed).

Moreover, the Court also notes that Elliotte testified to his familiarity and personal involvement in Critical Incident Response Team ("CIRT") investigations. *Id.* at 215:19–25, 216:1–9. Those investigations result primarily from officer-involved shootings. *Id.* at 215:23–25. Elliotte had previously been investigated twice by the CIRT team, and during those investigations, he had been told that the matter was "a criminal investigation, not an administrative investigation." *Id.* at 216:6–18. As a result, he had been advised that he had "the option not to comply with the with [the investigation] because they are . . . criminal in nature and

[the] state police sergeant or lieutenant that's there is not investigating you for policy violations but, rather, criminal acts to determine if—if the shootings were justified criminally." *Id.* at 217:3–11. While this testimony does not reflect a perfect understanding of *Garrity*, the Court finds it illustrative of Elliotte's belief that administrative investigations, which he understood to include both RR investigations and Internal Affairs investigations, required cooperation because his statements could not be used against him in a criminal proceeding. In other words, he believed that, during administrative investigations, *Garrity* immunity applied. On the other hand, where his statements were likely to be used against him in a criminal proceeding, he was not forced to comply with the investigation.

None of the above-cited circumstances are alone determinative. Instead, the Court must consider the totality of the circumstances. *See McKinley*, 404 F.3d at 436 n.20. Given the weight of the evidence supporting Elliotte's testimony that he subjectively believed that he would suffer a substantial penalty if he failed to cooperate, the Court cannot find that Elliotte's claimed subjective belief was dubious or implausible, or not credible. *See Cook*, 526 F. Supp. 2d at 7 (finding defendant's claimed belief to dubious and implausible); *Jianyu Huang*, 2014 WL 12789662, at *8–9 (finding defendant's claimed belief to be "not credible"). In sum, then, the Court has considered the totality of the circumstances and the evidence of record and concludes that Elliotte has satisfied his burden of demonstrating that he subjectively believed that he was likely to face a substantial penalty for failure to respond to Sergeant Partin's questions during the RR process.  The Court next considers whether this subjective belief was objectively reasonable.

### 2.  Objective Element

As already explained, Elliotte's subjective belief must be reasonable, based on the totality of the circumstances. *McKinley*, 404 F.3d at 436 n.20. Again, Elliotte bears the burden of

demonstrating that his subjective belief was objectively reasonable. *See, e.g.*, *Dellinger*, 2013 WL 4177400, at *1 (collecting cases). On this issue, the parties' arguments diverge on various points. The United States, for example, raises the following objections: the KSP policies that required Elliotte to obey lawful orders and answer questions did not apply in this case and were not sufficient to trigger *Garrity*, and further, Elliotte's understanding of these policies was unreasonable in light of KSP's Internal Affairs Investigation Policy and the lack of any *Garrity* warnings; the threatened penalty was too speculative; and the RR procedures were routine matters not subject to *Garrity*, and Elliotte was not under investigation during those proceedings. *See* [R. 91]. The Court addresses each of these issues in turn.

### a. Was Elliotte's subjective belief reasonable in light of the various KSP policies and practices?

In his Motion to Suppress, Elliotte does not argue that he was explicitly threatened with disciplinary action for refusal to cooperate with the RR process. *See* [R. 55]. He relies instead on a theory of implicit coercion, arguing that KSP's policies compelled him to answer questions and cooperate during the RR process. *Id.* at 9. Specifically, Elliotte points to KSP's RR Policy, which mandates that an officer notify a supervisor if a use-of-force incident occurs and which also mandates that the supervisor interview the officers involved in that incident. *Id.* at 9; *see also* [R. 59-5 (RR Policy)]. Elliotte also cites to KSP's Standards of Conduct, which includes the Insubordination Policy that commands officers to "promptly obey any unlawful orders of a superior officer," and explains that the failure to do so constitutes insubordination, a Class A violation. [R. 55, p. 10]; *see also* [R. 55-14, p. 3, ¶ 9 (Insubordination Policy)]. The Standards of Conduct also include the provision on "Obstructing an Internal Investigation" that provides that, "[u]pon order of . . . their commanding officer, officers must answer and answer truthfully to any questions specifically directed and narrowly-related to the scope of employment and operations

- 61 -

of the agency which may be asked of them," and the failure to do so constitutes another Class A violation. [R. 55-14, p. 4, ¶ 10 (Obstruction Policy)]. Pursuant to these policies, a Class A violation may result in "dismissal, reduction in rank or pay, or suspension without pay for at least 21 working days" [R. 55, p. 10]; *see also* [R. 55-15, p. 10 (Agency Disciplinary System Policy)]. Elliotte further cites to the "chain-of-command hierarchy employed by KSP," arguing that it "required Trooper Elliotte to do as he was directed by his supervising officer." [R. 55, p. 10].

The Magistrate Judge agreed that Elliotte's subjective belief was reasonable in light of these various policies, the "command authority" held by superior officers, and the "culture and consensus within this paramilitary organization that failure to answer truthfully is not an option." [R. 88, p. 64]. In reaching this conclusion, the Magistrate Judge explained that the threat of a substantial penalty need not be explicit and can instead be implied through statutes, regulations, or policies and procedures known to the employee. *Id.* at 9–11. The Magistrate Judge further explained that, in the Sixth Circuit, the threatened sanction need not be termination and can instead be some other "substantial" job-related sanction. *Id.* at 8–9.

Certain aspects of this analysis are not in dispute. The United States does not argue that the threat of a substantial penalty must be explicit,[25] nor would the case law support that position. *See, e.g.*, *Vangates*, 287 F.3d at 1321–22 ("In the absence of a direct threat, we determine whether the officer's statements were compelled by examining her belief and, more importantly, the objective circumstances surrounding it."); *Smith*, 821 F.3d at 1304 (applying subjective-

---

[25] To the extent that the United States points out that Elliotte was never expressly threatened with discipline if he failed to cooperate, [R. 91, pp. 2, 7], it does so in the context of its argument that Elliotte must face the same coercion as the officers in *Garrity*. *Id.* at 7.  The Court has briefly addressed that fact in the subjective analysis section above. *See supra* Section III(C)(1)(b). To be clear, however, the two-step subjective-objective test applies in the absence of an explicit threat. *See, e.g.*, *Vangates*, 287 F.3d at 1231–22; *Smith*, 821 F.3d at 1203. In other words, the fact that Elliotte was not explicitly threatened is not determinative, and the Court again stresses its obligation to consider the totality of the circumstances in applying the two-part test outlined in *McKinley*.

objective test because there was no direct threat of termination or other substantial penalty); *Goodpaster*, 65 F. Supp. 3d at 1029–30 (explaining that the Supreme Court in *Murphy* "inquired merely whether 'the State, either expressly or by implication, assert[ed] that invocation of the privilege would lead to [a penalty]'" (quoting *Murphy*, 465 U.S. at 435)). The United States also does not dispute that the threatened penalty may be something other than termination so long as it is a sufficiently substantial penalty like demotion or suspension. [R. 96, p. 2]; *see also McKinley*, 404 F.3d at 436 n.20 ("It is sufficient, we think, for a jury to conclude that he reasonably believed that substantial penalties were likely to result from his refusal to answer questions during the second interview; although job termination is surely a 'substantial penalty,' so, too, are other employer actions, such as ordering a demotion or suspension."). The United States further agrees that the penalties at play in this case—demotion, suspension without pay, and termination—are substantial penalties. [R. 96 ("The Defendant argues that all enumerated penalties listed for Class A violations satisfy the *McKinley* standard for a substantial penalty, and the United States agrees.")].

However, the United States argues that the plain language of the various KSP policies shows that any subjective belief held by Elliotte was not objectively reasonable. [R. 91, pp. 14–20]. Among other things,[26] the United States takes issue with the Magistrate Judge's conclusion that

> compulsion results from the policies that superior officers have command authority, the belief that every question of a superior officer includes an implied command to answer truthfully, the policy on obstruction that requires truthful answers in internal investigations, and the culture and consensus within this paramilitary organization that failure to answer truthfully is not an option.

---

[26] To the extent the United States argues that Elliotte "failed to prove that either of the general policies would ever have been applied to his RR statements," [R. 91, pp. 15–17], or the Internal Affairs policy demonstrates the difference between a compelled statement and a non-compelled statement, *id.* at 15–19, the Court addresses those arguments below.

[R. 88, p. 64]. The United States argues that this analysis "stands in opposition to relevant *Garrity* case law," citing to five cases from other circuits. [R. 91, p. 19].

First, the United States quotes from *United States v. Wendt*, 2023 WL 4248754, at *6. In that case, the district court applied the subjective-objective test to determine whether certain statements were compelled. *Id.* In doing so, it first addressed "what 'compelled' does—and does not—mean in this context." *Id.* The court acknowledged that,

> [i]n one sense, a government official always feels "compelled" to answer questions posed by a supervisor; after all, it is difficult to imagine a government employer (or any other employer, for that matter) tolerating a subordinate's refusal to answer questions or provide information. But this cannot possibly be enough to trigger *Garrity*, as it would mean that any statement made by a government official in response to any question from a supervisor is privileged, no matter the context. Nothing in *Garrity* or its progeny suggests such a wide net.

*Id.*

But *Wendt* did not turn on the precise issue raised in the United States' objections—whether an insubordination and/or obstruction policy can render a statement "compelled" for purposes of *Garrity*. In fact, it does not appear that Wendt relied on any such policy, so there is no helpful discussion of such policies in that case. However, in the other cases cited by the United States, the defendants did rely on general cooperation policies. *See Wells*, 55 F.4th at 794 (relying in part on employment manual that directed employees to provide "full and truthful answers during any inquiry or investigation"); *Smith*, 821 F.3d at 1302 (relying on administrative regulations requiring employees to cooperate with investigations by providing information and/or statements or else face progressive disciplinary sanctions); *Waldon*, 363 F.3d at 1112 (relying on regulations that "reflect[ed] only a general expectation that police officers will cooperate and testify" and a municipal code requirement that the city reserved the right to discipline employees exercising their Fifth Amendment privilege); *Vogt*, 384 F. Supp. 3d at 1309

(relying in part on a personnel manual provision providing that insubordination was misconduct subject to discipline, including termination).

These cases are not particularly helpful on this issue, however. For example, in both *Wells* and *Smith*, the defendants' *Garrity* arguments failed on the subjective prong, as those defendants had failed to provide any testimony about their subjective belief. *Wells*, 55 F.4th at 798; *Smith*, 821 F.3d at 1304.[27] As a result, neither court considered the objective prong. *Wells*, 55 F.4th at 798; *Smith*, 821 F.3d at 1304. And in *Waldon*, the courts stated only, "We agree with the district court that Waldon's belief was not objectively reasonable," with no further explanation and no discussion of the district court's analysis. *Waldon*, 363 F.3d at 1112.

Unlike those cases, the *Vogt* case provides a bit more analysis on this issue. In that case, Vogt, a police officer, reported to his employer that he had previously found a folding knife while on duty, but he had failed to report it as "found property" and instead kept the knife, in violation of departmental policies. 384 F. Supp. 3d at 1302. A "professional standards investigation" was opened to determine if Vogt had violated a departmental policy, and Vogt was interviewed. *Id.* The investigation indicated that the knife may have been turned in to Vogt as evidence in a felony property damage case, and Vogt was charged with various criminal charges, including concealing evidence. *Id.* at 1304. A preliminary hearing took place, and witnesses testified as to Vogt's statements about the knife. *Id.* The charges were ultimately dismissed. *Id.*

Vogt then brought a 42 U.S.C. § 1983 claim. *Id.* at 1305. Among other things, Vogt argued that his incriminating statements had been used against him in violation of his *Garrity*

---

[27] With respect to certain other statements made in *Smith*, the court assumed without deciding that those statements were compelled under *Garrity* but found that the defendant had voluntarily, knowingly, and intelligently waived his Fifth Amendment rights by executing a consent form. *Smith*, 821 F.3d at 1304.

rights. *Id.* Specifically, he stated that he believed he would be fired if he failed to respond to his superior's questions during the interview. *Id.* To support this argument, Vogt relied on various facts, including the fact that the police department was a paramilitary organization where insubordination was not tolerated, and the personnel manual's provision explaining that insubordination constituted misconduct that could result in discipline, including termination. *Id.* at 1309. The Court found that these facts were "not material to the issue" of whether Vogt's stated subjective belief was objectively reasonable. *Id.* at 1310. The court explained,

> As an initial matter, it might be pointed out that virtually all employees are subject to discipline for failing to follow a supervisor's orders, regardless of whether they are in a paramilitary organization. But even assuming that principle was more rigidly applied at the [police department] than elsewhere, there is still no evidence that Defendant gave Plaintiff any order that precluded him from asserting a Fifth Amendment privilege or that suggested he would be sanctioned for doing so. . . . *In the absence of some objective indication from Defendant that Plaintiff would be punished if he invoked the privilege, no reasonable inference of compulsion arises from the existence of Defendants' policy of punishing insubordination.*

*Id.* (emphasis added). The court acknowledged that "[p]erhaps Plaintiff felt some uncertainty about invoking his right to remain silent when [his superior] interviewed him." *Id.* at 1311. However, the court concluded, "[t]hat does not mean his statements were compelled." *Id.* The court explained,

> Plaintiff undoubtedly felt pressure to answer the questions. . . . But it is "[t]he threat of punishment *for reliance on the privilege*" that distinguishes improper compulsion from "the ordinary case in which a witness is merely required to appear and give testimony." *Murphy*, 465 U.S. at 435 (emphasis added). The material question is whether some form of official compulsion denied Plaintiff "a free choice to admit, to deny, or to refuse to answer." *Salinas v. Texas*, 570 U.S. 178, 185 (2013) (citation omitted.) No evidence is cited to show that Defendant improperly coerced Plaintiff into giving up the option of refusing to answer questions. The Fifth Amendment does not prohibit a witness from testifying voluntarily in matters which may incriminate him. If he desires the protection of the privilege, "he must claim it or he will not be considered to have been 'compelled' within the meaning of the Fifth Amendment." *Murphy*, 465 U.S. at 427 (citation omitted).

*Id.* at 1311–12. The court therefore found no Fifth Amendment violation and granted summary judgment in favor of the defendants. *Id.* at 1312.

In contrast to *Vogt*, other courts have found that certain policies requiring cooperation can compel an employee's statements under *Garrity*. In *Goodpaster*, for example, the United States Postal Service ("USPS") Office of Investigator General began an investigation into the theft of certain USPS parcels. *Goodpaster*, 65 F. Supp. 3d at 1019. Goodpaster, a USPS employee, was investigated and eventually interviewed. *Id.* Goodpaster later moved to suppress the statements made during that interview, arguing, among other things, that they were compelled by the threat of job-related discipline in violation of the Fifth Amendment. *Id.* at 1021. For support, Goodpaster cited to a regulation that required him to "cooperate with all audits, reviews, and investigations conducted by the Office of Inspector General," or else face "disciplinary or other legal action." *Id.* at 1029. He also relied on a workplace policy that required him to "cooperate in any postal investigation, including Office of Inspector General investigations" and provide for "appropriate disciplinary measures" for the failure to cooperate. *Id.*

The district court found that, "[o]bjectively, these provisions created a penalty situation." *Id.* at 1029–30. First, the court acknowledged that the provisions did not "*clearly* communicate that [the] employee must 'answer all' questions." *Id.* at 1029 (citation omitted). But, the court explained, "[a]n order to 'cooperate' demands more of the reasonable employee than an order merely to be 'truthful.'"[28] *Id.* (citation omitted). Thus, "had Goodpaster remained silent, the regulation and the [workplace policy] 'would have justified' his employer (USPS) firing him." *Id.* (citations omitted). As a result, the court concluded, there was a "reasonable basis for

---

[28] In the Recommended Disposition, the Magistrate Judge explained that a policy or regulation need not expressly target the employee's Fifth Amendment right to remain silent; instead, it is sufficient that the policy or regulation require the employee to answer questions or else face substantial punishment. [R. 88, pp. 13–16]. The United States does not object to this portion of the Recommended Disposition.

concluding that [the employer] attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Id.* (quoting *Murphy*, 465 U.S. at 437) (internal quotation marks omitted).

The different outcomes in *Vogt* and *Goodpaster* can be explained by the differences in the policies at issue in those cases. In *Vogt*, the defendant relied on a general insubordination policy. That policy stated, "Refusal to abide by any lawful official regulation or order, [and] failure to obey any proper direction made by a supervisor or department head" may be grounds for termination. *Vogt*, 384 F. Supp. 3d at 1310 n.8. But this general directive to obey orders, even when read in conjunction with the paramilitary structure of the police department, did not mean Vogt's statements were "compelled" within the meaning of *Garrity*. *Id.* at 1310. In that case, the court specifically noted that there was no express or implied threat of punishment for invoking the right to remain silent. *Id.* This analysis is in line with other cases where courts have concluded that "[o]rdinary job pressures, such as the possibility of discipline or discharge for insubordination, are not sufficient to support an objectively reasonable expectation of discharge." *Graham*, 991 N.E.2d at 1122 (quoting *People v. Sapp*, 934 P.2d 126, 1372 (Colo. 1997)) (internal quotation marks omitted).

On the other hand, the regulation and workplace policy in *Goodpaster* contained more than just a general requirement to obey orders. Instead, those provisions addressed the specific type of investigation at issue (one conducted by the Office of the Inspector General) and required that all employees "cooperate" in all such investigations, or else face disciplinary measures. *Goodpaster*, 65 F. Supp. 3d at 1029. The court understood the term "cooperate" to implicitly require that the employee answer all questions during the investigation. *Id.* Had the employee refused to do so—in other words, had the employee remained silent—his employer could have

relied on the regulations and workplace policy to terminate him. *Id.* This created the impermissible penalty situation. Other courts have similarly ruled that provisions requiring an individual to answer all questions take the "impermissible step" of requiring the individual "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." *United States v. Saechao*, 418 F.3d 1073, 1078 (9th Cir. 2005) (quoting *Murphy*, 465 U.S. at 436); *see also United States v. Bahr*, 730 F.3d 963, 966 (9th Cir. 2013) (finding that supervised release condition requiring "full disclosure" of past misconduct, with no provision for immunity, unconstitutionally compelled self-incrimination).

The Court finds that this case is more like *Goodpaster* than *Vogt*. In the present case, there exists a general insubordination policy that required KSP officers to obey the lawful orders of a superior officer, or else be guilty of a Class A violation. *See* [R. 55-14 (Insubordination Policy)]. In *Vogt*, a similar general insubordination policy was insufficient to trigger *Garrity*. And, like in *Vogt*, Elliotte was not expressly ordered to answer questions during the RR interview, so he was not faced with the choice to remain silent or otherwise disobey a lawful order. Moreover, to the extent that Elliotte relies on the RR Policy, the Court notes that the policy does not contain any provision requiring the interviewee to answer questions. *See* [R. 59-5 (RR Policy)].

Unlike *Vogt*, however, there is another policy at play in this case. The Obstruction Policy clearly commands KSP officers to "*answer and answer truthfully* any questions specifically directed and narrowly-related to the scope of employment and operations of the agency which may be asked of them," and it explains that the failure to do so is a Class A violation, which could result in demotion, suspension, or termination. [R. 55-14, p. 4, ¶ 10 (Obstruction Policy) (emphasis added); R. 55-15, p. 10 (Agency Disciplinary System Policy)]. This is similar to the

policy cited in *Goodpaster*, which required "cooperation," and it therefore required the employee to answer truthfully all questions posed to him, or else face discipline. *Goodpaster*, 65 F. Supp. 3d at 1029.  In fact, unlike the policy and regulation at play in *Goodpaster*, the Obstruction Policy here does not use the more general term "cooperate," but instead clearly states that the officer must "answer and answer truthfully" the questions put to him. [R. 55-14, p. 4, ¶ 10 (Obstruction Policy)]. Under *Goodpaster* and similar cases, such a policy may be sufficient to demonstrate compulsion. And in this case, the Court finds that the Obstruction Policy, when ready together with other KSP policies, clearly creates an impermissible penalty situation.

However, on this point, the United States argues that the Obstruction Policy does not apply to RR investigations. [R. 91, p. 16]. Instead, the United States argues, "[t]he plain language of the obstruction policy demonstrates that it was intended to apply to statements made during investigations into alleged trooper misconduct, namely [Internal Affairs] investigations." *Id.* For support, the United States notes that the policy itself is titled "Obstructing an Internal Investigation." [R. 55-14, p. 4, ¶ 10 (Obstruction Policy)]; *see also* [R. 91, p. 16]. The terms of the Obstruction Policy further indicate that it applies to internal investigations "of alleged misconduct." [R. 55-14, p. 4, ¶ 10 (Obstruction Policy)]; *see also* [R. 91, p. 16]. From this, the United States argues that the Obstruction Policy applies in the context of an Internal Affairs investigation into suspected misconduct. [R. 91, pp. 16–17]. But in this case, there was no allegation of misconduct and therefore "no 'internal investigation for [Elliotte] to obstruct." *Id.* at 17.

The Court disagrees that the plain language of the Obstruction Policy neatly resolves this issue. The policy states, in full:

**Obstructing an Internal Investigation**: No officer shall destroy, conceal or alter any record, or attempt to coerce or intimidate, or attempt to influence the testimony

of, any witness or potential witness in any internal investigation of alleged misconduct. This shall include officers contacting or attempting to contact the complainant and/or witnesses, or otherwise discussing the case with unauthorized persons, after they become aware of a complaint against them and any ensuing investigation. Upon order of the Commissioner, the Commissioner's designee, or their commanding officer, officers must answer and answer truthfully to any questions specifically directed and narrowly-related to the scope of employment and operations of the agency which may be asked of them. No officer shall refuse or knowingly fail or omit to answer fully and truthfully all questions specifically directed and narrowly related to the scope of employment and operations of the agency, which may be asked. Obstructing an internal investigation is a Class A violation.

[R. 55-14, p. 4, ¶ 10]. The policy does not reference either an RR investigation or an Internal Affairs Investigation; it refers only generally to "internal investigations." *Id.* It does reference "internal investigation[s] of alleged misconduct" and "complaint[s] against [officers] and any ensuing investigation," which could be in refence to a formal Internal Affairs investigation. But the plain language of the policy does not clearly limit its application to only Internal Affairs investigations or only internal investigations triggered by specific complaints of misconduct.

Because the language of the Obstruction Policy does not resolve this issue, the Court looks to the testimony discussing that policy. For example, Sergeant Partin testified that the RR investigation was different than an Internal Affairs investigation, though he also acknowledged that RR reports can be prompted by Internal Affairs and can ultimately "end up with" Internal Affairs and can potentially become the "building blocks" upon which Internal Affairs builds a case. [R. 83, pp. 11:13–24, 45:4–18]. He also described an RR investigation as a type of "administrative internal investigation" and "administrative investigation." *Id.* at 12:12–15, 12:23–25, 67:18–19. Ms. Kincer and Lieutenant Dingess testified similarly. *Id.* at 105:10–25, 106:1–21; 125:15–20 (Kincer); *id.* at 195:12–25, 196:1–23 (Dingess).

The United States' witness, Captain Green, also testified that an RR investigation is an "administrative investigation." [R. 84, p. 33:12–14]; *see also id.* at 50:9–22 (discussing

relationship between RR investigations and Internal Affairs investigations). Like other witnesses, he also testified that an RR investigation and its findings can be "a factor to be considered from internal affairs in classification decisions" and "in investigative decisions." *Id.* at 61:12–18. As Captain Green summarized, an RR investigation "can be used to determine that an internal affairs investigation needs to take place. . . So it can lead to an internal affairs investigation." *Id.* at 62:6–11. But an internal affairs investigation only stems from those RR investigations where misconduct is identified. *Id.* at 62:19–25, 63:1–7. In other words, "the [RR] process indeed is sometimes where the problem or concern of misconduct is first unearthed . . . and once unearthed, that could lead to internal affairs investigations" and other procedures that might "result in punishment." *Id.* at 63:3–7. From this testimony and the testimony from other witnesses cited above, the Court understands that the very purpose of an RR investigation is to determine if the involved officer used an unreasonable amount of force—i.e., whether misconduct occurred and should be further investigated by Internal Affairs.

Each of the defense witnesses also testified to their own understanding of how the Obstruction Policy applied in this case, with each witness testifying to his or her own belief that Elliotte would have faced discipline for obstruction (and/or insubordination) had he refused to answer all of Sergeant Partin's questions during the RR process. *See, e.g.*, [R. 83, pp. 40:16–17, 41:23–25, 42:1–4 (Partin)]. For example, Sergeant Partin read from the Obstruction Policy during his testimony and expressed his belief that the policy was applicable during the RR investigation. *Id.* at 41:6–25, 42:1–4. Specifically, he agreed that the questions asked during Elliotte's RR interview "were related to the scope of his employment and the operations of the agency,"[29] and he further testified that the Obstruction Policy "makes it a Class A violation for

---

[29] The United States does not dispute that the questions asked during the RR investigation were within the scope of Elliotte's employment and about the operations of the agency.

an officer to refuse to answer fully and truthfully questions like the ones [Partin] posed to [Elliotte] during [the RR] investigation." *Id.* at 41:18–25, 42:1–4. Ms. Kincer, KSP's own General Counsel, and Lieutenant Dingess testified similarly. *Id.* at 124:25, 125:1–20 (Kincer); *id.* at 172:19–25, 173:1–3, 195:3–11 (Dingess). Dingess, for example, testified that believed that "it would be insubordination for a trooper to refuse to answer an investigating supervisor during a [RR investigation]," and it could also qualify as inefficiency "as well as obstructing an internal investigation." *Id.* at 172:19–25, 173:1–3; *see also id.* at 195:3–11.

The Court's understanding of this testimony is informed by the witnesses' testimony about the paramilitary nature of KSP. For example, Sergeant Partin responded in the affirmative when asked, "Based upon your years of experience with KSP, do you believe it's fair to say there's a general culture in the KSP that embraces the idea that troopers have to answer higher-ranking officers about important matters like [RR] investigations?" *Id.* at 53:17–22. Ms. Kincer responded affirmatively to the same question and also testified regarding this culture and the paramilitary nature of KSP. *See, e.g.*, *id.* at 123:3–14, 128:21–25, 137:5–19. Essentially, all witnesses acknowledged the common understanding at KSP that, under existing policies and the culture of the organization, officers were compelled to answer truthfully all questions put to them in an RR interview.

As noted above, the court in *Vogt* considered a similar paramilitary culture at a police department, but found that fact to be immaterial. *Vogt*, 384 F. Supp. 3d at 1310. That court acknowledged, and this Court agrees, that "virtually all employees are subject to discipline for failing to follow a supervisor's orders, regardless of whether they are in a paramilitary organization." *Id.* But the *Vogt* court went on to say that, "even assuming that principle was more rigidly applied at the [police department] than elsewhere, there is still no evidence that

Defendant gave Plaintiff any order that precluded him from asserting a Fifth Amendment privilege or that suggested he would be sanctioned for doing so." *Id.* In other words, without something beyond a general directive to obey orders and without an "objective indication from Defendant that Plaintiff would be punished if he invoked the privilege," the officer's statements were not compelled. *Id.*

On this point, the facts of *Vogt* and the present case diverge. Here, as explained above, there is a specific policy—the Obstruction Policy—that commands an officer to answer truthfully all questions posed to him during the course of an internal investigation. *See* [R. 55-14, p. 4, ¶ 10 (Obstruction Policy)]. There is ample testimony characterizing an RR investigation as a type of internal investigation. Logic dictates that conclusion as well, as RR investigations are conducted internally within KSP for the purpose of determining whether the organization's internal policies and procedures have been violated (i.e., whether misconduct occurred). *See, e.g.*, [R. 59-5, p. 1 (explaining purpose of the RR Policy); R. 83, p. 168:7–13 (Dingess explaining same)]. KSP's chain-of-command policies and paramilitaristic culture only reinforces the witnesses' beliefs that an officer must answer all questions asked of him during an RR interview and that the refusal to answer questions would amount to obstruction under the Obstruction Policy. Thus, while the Court does not rely heavily on the KSP paramilitary structure, it is one circumstances that the Court considers when reviewing the totality of the circumstances.

To the extent that the United States argues that the terms of the Internal Affairs Policy, [R. 59-6], cut against the above-cited testimony, the Court disagrees. As noted above, that policy explains that officers under an Internal Affairs investigation are required to answer questions during an interview, but their statements are subject to *Garrity* protection, and they should be

read *Garrity* warnings. *See* [R. 59-6, pp. 2–3 (Internal Affairs Policy)]. The United States argues that, by creating this Internal Affairs Policy, "KSP has clearly delineated the difference between those statements that fall under normal KSP operating procedure, including RR interviews, and those that are subject to being compelled under *Garrity*." [R. 91, p. 18]. By holding that RR statements are also compelled, the United States argues, "this Court would render completely superfluous the KSP [Internal Affairs Policy]." *Id.* at 18–19. The United States also argues that such a holding would "require the Court to assume that KSP violates the Fifth Amendment of the Constitution on a regular basis by enacting an implied policy compelling troopers to abandon their right against self-incrimination without ever advising them of their rights or immunity." *Id.* at 19.

But these arguments are unconvincing. First, the Court is not bound by KSP's characterization of any statements as compelled or not compelled. In other words, the fact that KSP recognizes that Internal Affairs Investigations are subject to *Garrity* protections is not determinative and does not answer the question of whether *RR investigations* are subject to *Garrity*. Instead, the Court must consider the totality of the circumstances present in this case to determine whether Elliotte subjectively believed he was likely to be punished if he refused to answer Partin's questions, and whether that belief was objectively reasonable. *McKinley*, 404 F.3d at 436 n.20.

And, in fact, the evidence of record actually indicates that KSP officials, including its General Counsel, believed RR investigations were subject to *Garrity* protections. [R. 83, p. 122:15–23 (Kincer explaining her belief that the statements made during an RR investigation were *Garrity*-protected)]; *id.* at 129:5–21 (Kincer explaining KSP's practice of treating RR statements as *Garrity*-protected)]; *id.* at 170:4–17 (Dingess explaining his belief that the RR

statements were *Garrity*-protected and could not be used in a criminal investigation). While this is not alone determinative, and of course it is for the Court to determine whether the statements at issue were protected,[30] this testimony certainly strengthens Elliotte's argument that his subjective belief was objectively reasonable. In other words, if top officials at KSP charged with interpreting and implementing KSP policy, including the head of its legal department, believed that RR statements were *Garrity*-protected, such lends credence to the argument that the same belief held by Elliotte was objectively unreasonable.

On this point, the Court acknowledges Captain Green's testimony that he believed RR statements were *not Garrity*-protected. [R. 84, p. 63:20–24]. But, like the Magistrate Judge, the Court finds that this testimony "does not square well with" Captain Green's testimony that he would have felt compelled to answer questions during the RR interview if he were questioned under similar circumstances. [R. 88, p. 50]; *see also* [R. 84, p. 71:11–25].  Further, while Captain Green opined that Internal Affairs interviews *would be* protected under *Garrity*, this appears to be because he believed Internal Affairs investigations focus on suspected misconduct, while RR investigations do not involve suspected misconduct. [R. 84, pp. 63:16–25, 64:1–3, 64:17–23]. But this testimony sits in contrast to his testimony that Internal Affairs investigations into suspected misconduct may rely on RR reports and the evidence obtained in RR investigations. *Id.* at 63:8–15.

Further, the Internal Affairs Policy is not superfluous simply because there are other circumstances under which *Garrity* might apply. Instead, the policy merely reflects KSP's understanding that, in the context of Internal Affairs investigations, it is always necessary or at

---

[30] Like the Magistrate Judge, this Court recognizes that lay witnesses in this case have sometimes used legal terms like "compelled" or "coerced" or "*Garrity*-protected," but this testimony does not alter the Court's own obligation to determine whether Elliotte's statements were compelled within the meaning of *Garrity*. That is a question for the Court.

least advisable to provide *Garrity* protections. The policy does not state nor even suggest that Internal Affairs investigations are the *only* circumstances that might trigger *Garrity*. In fact, the Internal Affairs Policy appears to acknowledge that *Garrity* may be applicable in interviews that take place prior to the filing of a formal complaint—and specifically in the context of an administrative inquiry. *See* [R. 59-6, p. 2 ¶ 4(d) ("Any officer suspected of violating the agency's Standards of Conduct may be notified of their '*Garrity* Rights' if they are interviewed prior to the filing of a complaint, or if an internal affairs investigation or administrative inquiry is conducted prior to the submission of the complaint letter.")].

Moreover, under the United States' reading of the policies, the only thing KSP needs to do to avoid *Garrity* complications is simply leave out any reference to *Garrity* in the relevant policies. And lastly, the Court notes that KSP does not violate the Fifth Amendment by compelling incriminating statements by threat of employment-related penalties or by failing to expressly advise officers of their rights or immunity, as the United States suggests. In fact, the law is clear that *Garrity* immunity can attach even in the absence of an express *Garrity* warning. Instead, the Fifth Amendment is violated when those compelled statements are used against that officer in a subsequent criminal proceeding. *See, e.g.*, *McKinley*, 404 F.3d at 430.

In sum, the Court finds that the above-cited KSP policies, and specifically the Obstruction Policy, when read together and with the testimony on record, weigh in favor of finding that Elliotte's subjective belief was objectively reasonable. Accordingly, to the extent the United States has objected to the Magistrate Judge's reliance on these policies, the Court disagrees and overrules that objection.

**b.  Was the threatened penalty "likely" or was it merely speculative?**

- 77 -

The United States also argues that Elliotte has failed to meet his burden of demonstrating that the threatened penalty was "likely to result," and not merely speculative.  [R 91, p. 13]. As the Sixth Circuit explained in *McKinley*, "[i]t is sufficient . . . for a jury to conclude that he reasonably believed that substantial penalties *were likely to result* from [the officer's] refusal to answer questions." *McKinley*, 404 F.3d at 436 n.20 (emphasis added). To determine what this "likely to result" standard requires, the Magistrate Judge considered the ordinary meaning of the term "likely" and concluded that "it appears the *McKinley* standard requires a defendant to prove he had a reasonable belief that a substantial penalty would *more likely than not* follow a refusal to answer questions." [R. 88, p. 12 (emphasis in original)]; *see also id.* at 12 n.4 (referring to definitions of "likely" and "probable consequence" in Black's Law Dictionary).

 The United States appears to object to the "more likely than not" language utilized in the Recommended Disposition, though it only briefly addresses this argument in a footnote. [R. 91, p. 14, n.3]. That footnote states, in full,

> The [Recommended Disposition] crafts its own legal standard to determine how to analyze the likelihood of punishment: "more likely than not." While a number of cases require that a punishment be immediate or automatic upon an employee taking the  Fifth, the Court does not need to decide which standard to use to analyze the Defendant's claim, as the lack of evidence means the motion should be denied under either standard.

*Id.* While the United States does not develop this argument,[31] the Court will nevertheless briefly address it. First, to the extent the United States suggests that the Court should employ the automatic and/or mandatory standard announced in other circuits, the Court declines to do so. As

---

[31] Because this argument is wholly undeveloped, the Court considers it waived. *See Brown v. Astrue*, No. 09-387-HRW, 2010 WL 4878866, *3 (E.D. Ky. Nov. 24, 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)).

already explained, the Sixth Circuit's standard, as articulated in *McKinley*, stands in contrast to some other courts' interpretations of *Garrity*, as those courts require that the threatened discipline be automatic and/or mandatory.[32] *See supra* Section III(B)(3). But those cases are not binding on this Court, and instead, the Court will follow binding Sixth Circuit precedent, namely, *McKinley*.

Further, to the extent the United States argues that the Magistrate Judge's "more likely than not" language somehow crafted a new legal standard, the Court finds that argument—which is wholly undeveloped and addressed only in a footnote[33]—to be without merit. The Magistrate Judge relied on the ordinary meaning of the term used in *McKinley*: likely. That term is defined in Black's Law Dictionary as "[a]pparently true or real; probable" and "[s]howing a strong tendency; reasonably expected." *Likely*, Black's Law Dictionary (11th ed. 2019). It is similarly defined in Merriam-Webster as "having a high probability of occurring or being true" and "very probable" when used as an adjective, and "in all probability" and "probably" when used as an adverb. *Likely*, Merriam-Wesbter Online Dictionary, https://www.merriam-webster.com/dictionary/likely (last visited Nov. 6, 2023). "Probable," in turn, is defined as "[l]ikely to exist, be true, or happen." *Probable*, Black's Law Dictionary (11th ed. 2019). And a "probable consequence" is "[a]n effect or result that is *more likely than not* to follow its

---

[32] In the Recommended Disposition, the Magistrate Judge recognized a pre-*McKinley* Sixth Circuit case, *United States v. Bowers*, 739 F.2d 1050 (6th Cir. 1984), in which that Court's decision turned, at least in part, on testimony that the threatened discipline "would not necessarily have followed had Bowers refused to cooperate." *Id.* at 1056; *see also* [R. 88, p. 12, n.3 (discussing *Bowers*). But, the Magistrate Judge explained, subsequent case law, including *McKinley*, makes clear that the threatened penalty need not be automatic or mandatory for *Garrity* protections to apply. [R. 88, p, 12, n.3]. Neither party objects to this discussion of *Bowers*, nor does either party rely on *Bowers* in their post-Recommended Disposition briefing. And while the United States relied on *In re Justice* in its earlier briefing, *see* [R. 86, p. 19], it does not reference that case in its post-Recommended Disposition briefing.

[33] Again, given how undeveloped this argument is, the Court considers it waived. *See Brown*, 2010 WL 4878866, at *3.

supposed cause," *Consequence*, Black's Law Dictionary (11th ed. 2019) (emphasis added). The United States has provided no explanation as to why the ordinary meaning of these terms is incorrect or inapplicable in this case, or what it believes the term "likely" requires. Accordingly, this Court will also apply the ordinary meaning of the term "likely."

With this standard in mind, the Court turns to the United States' argument that Elliotte failed to satisfy his burden of proving that the threatened penalty was likely, rather than merely speculative or tenuous. For support, the United States cites to five cases out of other circuits. *See* [R. 91, p. 14 (citing *Smith*, 821 F.3d at 1303; *United States v. Naggs*, No. 18-CR-130, 2020 WL 10458572, at *9 (E.D. Wis. June 1, 2020); *United States v. Vorley*, No. 18 CR 00035, 2020 WL 1166185, at *8 (N.D. Ill. Mar. 11, 2020); *Dellinger*, 2013 WL 4177400, at *3; *Cook*, 526 F. Supp. 2d at 8 (D.D.C. 2007))].  However, none of the cited cases are particularly illuminating on this issue. First, none of these courts applied the standard announced in *McKinley*, i.e., that substantial penalties were "likely to result." *McKinley*, 404 F.3d at 436 n.20. Instead, most of the cited cases appear to require proof that the employee would have been *terminated*, rather than suffer some other substantial penalty short of discharge, and some of the cases require an automatic or mandatory penalty, rather than one that is "likely to result."

For example, in *Cook*, the officer-defendant was required by workplace policies to complete certain written reports, including field reports and use-of-force reports. *Cook*, 526 F. Supp. 2d at 3. His supervisor also instructed him to complete a use-of-force report after an incident. *Id.* Had the officer failed to fill out the report, a multi-step disciplinary process would have followed, including submission of a report of insubordination, an investigation, and review by a disciplinary panel, which would have then issued a proposal and findings for review by the

deciding official. *Id.* at 6. In a subsequent criminal prosecution alleging unreasonable force, Cook sought to suppress the statements he made in his reports. *Id.* at 2.

The district court found no *Garrity* violation. First, it noted that Cook's subjective belief was "dubious," for reasons this Court has already discussed. *Id.* at 7; *see also supra* Section III(C)(1)(a). But, even if Cook had demonstrated a subjective belief that he would be fired for refusing to submit the use-of-force report, that belief would not have been objectively reasonable because discipline would have been meted out "on a sliding scale," with a first offense punishable by anything from reprimand and removal. *Cook*, 526 F. Supp. 2d at 8. In other words, "removal [was] not mandated," and at least one witness's testimony suggested that removal was not likely for a first-time offender like Cook. *Id.* Witnesses also testified that they were unaware of any instance where an officer with a clean disciplinary record (like Cook) had been terminated for failing to file a report. The district court therefore concluded that, "[g]iven the lack of any policy mandating removal, as well as the absence of any precedent where removal had been invoked, it would not have been objectively reasonable for Cook to believe that he would be terminated if he declined to file the reports." *Id.*

On this point, the district court explained,

> *Garrity* does not stand for the proposition that a statement made in a standard report is coerced whenever an officer faces both the remote possibility of criminal prosecution if he files the report and the arguably even more speculative possibility of termination if he declines to do so. Rather, the touchstone of the *Garrity* inquiry is whether the defendant's statements were coerced and therefore involuntary. In Cook's case, both the possibility of prosecution and the possibility of termination were far too tenuous to support a finding that he was between "the rock and the whirlpool" at the time he filed his reports.

*Id.*[34]

---

[34] The Eleventh Circuit quoted this language in *Smith*, but it provided no further explanation and appears to have relied more heavily on the fact that the defendant in that case filled out standard or routine reports (something also

Likewise, in *Dellinger*, the district court explained that the officer-defendants bore the burden of demonstrating "that they believed their statements to be compelled on threat of *job loss* and that their belief was objectively reasonable." 2013 WL 4177400, at *1 (emphasis added). But the defendants testified that they were not sure what would happen to an officer who refused to fill out the reports at issue in that case, and both testified that they would probably face discipline, like being written up or possibly terminated. *Id.* at *2. The district court found that this evidence "amount[ed] to little more than speculation that they *would have been fired* for failure to prepare their reports." *Id.* at *3 (emphasis added). And in the other cases cited by the United States, the courts appear to have followed the *Indorato* line of cases that require an express threat and an automatic or mandatory (or at least certain) penalty. *See Naggs*, 2020 WL 10458572, at *9; *Vorley*, 2020 WL 1166185, at *8–9.

The present case is obviously distinguishable from those cited by the United States, as this Court must apply the standard recited in *McKinley*: that Elliotte reasonably believed that *substantial penalties* were *likely to result* from his refusal to answer questions. *McKinley*, 404 F.3d at 436 n.20. And in fact, at least one court has applied the *McKinley* standard and found that similar warnings—i.e., that refusal to answer questions *may* result in disciplinary action "up to and including termination"—was sufficient to trigger *Garrity*. *See Graham*, 991 N.E.2d at 1123. Accordingly, to the extent the cases relied upon by the United States require that the threatened penalty be *termination* or that the penalty must be *automatic or mandatory*, those cases are inapplicable here.

Having clarified the standard in this case, the Court turns to the United States' argument that Elliotte failed to show the threatened penalties in this case were likely to occur. On this

---

discussed in *Cook*). *See Smith*, 821 F.3d at 1303. To the extent the United States argues that the RR investigation was merely routine, the Court addresses that argument below. *See infra* Section III(C)(2)(c).

issue, the Magistrate Judge concluded that this case presented "a close call." [R. 88, p. 59]. The Magistrate Judge acknowledged, for example, that the potential punishments in this case "were speculative at the time of the RR interview in that no KSP trooper had ever refused to answer an RR question." *Id.* Nevertheless, the Magistrate Judge concluded, "the most likely explanation for this universal cooperation is that KSP troopers reasonably believed they will be substantially penalized for failure to cooperate," as demonstrated by the policies and the testimony on record. *Id.* Thus, the Magistrate Judge explained, "[e]ven though no KSP trooper has ever refused to answer questions or ever invoked the Fifth in an internal investigation, there is enough evidence on this record for the Court to conclude that the punishment for doing so is more than speculative." *Id.* at 62. The United States now objects to this analysis, arguing that the same evidence "clearly demonstrate[s] that [Elliotte] has failed to meet his burden." [R. 91, p. 13]. The Court disagrees.

True, the evidence of record demonstrates that no other KSP officer had been punished for failing to cooperate during an RR investigation, as no other officer had refused to cooperate. Neither Elliotte nor any other witness could identify any such officer. *See, e.g.*, [R 83, p. 207:15–18]; *id.* at 140:23–24, 141:1–4. In this sense, this case is somewhat similar to the *Cook* and *Dellinger* cases discussed above (though as already explained, those courts applied a different legal standard). But the facts here are also distinguishable from those cases. First, unlike in those cases, here there is an abundance of testimony explaining why no other KSP officer had ever refused to answer questions during an RR investigation. As discussed above, both the policies and the paramilitary culture of KSP instilled in its officers an understanding that they must answer to and obey their superiors. Put simply, refusing to answer a supervisor's questions is "absolutely unheard of." [R. 83, p. 207:3]. Thus, it is not surprising that the witnesses were

unaware of any officer who had refused to cooperate in an RR investigation, much less an officer who had been punished for doing so. As a result, the fact that no other officer had ever been disciplined for refusing to answer RR questions does not necessarily render the threatened punishment for doing so speculative for purposes of this Court's *Garrity* analysis, under the record in this case.

Moreover, there is evidence of the disciplinary process that would likely have unfolded had Elliotte refused to answer Sergeant Partin's questions. For example, Ms. Kincer was asked what would happen, in terms of discipline, if an officer refused to answer questions during an RR interview. *Id.* at 141:2–6. While she acknowledged that this scenario had never happened before, she stated that

> We would have to look at our Standards of Conduct. It would have to be a complaint written. We would have to classify it, potentially classify it, looking at their standards of conduct, investigate it. It may or may not be substantiated. We just don't know.

*Id.* at 141:7–11. She did testify, however, that the failure to answer questions during an internal investigation would qualify as obstruction under the Standards of Conduct, which is a Class A violation, and RR investigations are internal investigations. *Id.* at 124:25, 125:1–20. Moreover, when specifically asked whether the RR Policy "make[s] it certain what would have happened if the officer refused to answer an [RR] interview question," Ms. Kincer responded, "Yes and no, because then you would refer to the standards of conduct about [ob]structing an internal investigation and that . . . could be part of it. So . . . yes and no. I mean, not immediately." *Id.* at 151:18–25.

Captain Green also explained his understanding "of the procedure if a trooper refuses to answer the question [in an RR interview] under the Fifth Amendment." [R. 84, p. 37:12–14]. He stated,

- 84 -

. . . I don't know of that ever occurring. Not saying it hasn't, but I never heard of that instance.

But if it did occur, I would say the supervisor would likely stop the interview and speak with his—if it was a sergeant, probably speak to his lieutenant. It would make its way up the chain and get direction from legal.

It may be looked at depending on the circumstances. At that time it may be questioning what has gone on here that this trooper would lawyer up, so to speak, that -- or refuse to answer for.

It may very well be—it may very well—looking at it from a criminal standpoint before going forward with an administrative standpoint.

If direction from legal was to go forward with administrative, at that time then the trooper would likely be read the admonition of *Garrity* requiring them to answer questions narrowly focused to the investigation.

*Id.* at 37:15–25, 38:1–6.

In sum, this testimony indicates that, while the refusal to answer questions in an RR investigation might not result in automatic, mandatory, or immediate punishment, the legal department (i.e., Ms. Kincer) would be consulted. Ms. Kincer, in turn, would have to look at the Standards of Conduct (which includes the Insubordination and Obstruction Policies) to determine how to classify the officer's behavior, and it would likely be classified as obstruction, a Class A violation, which in turn would be punishable by demotion, suspension, or termination, if the claim is substantiated. There is nothing in the record to suggest that it would be *unlikely* for an officer to be disciplined for failing to respond to his supervisor during an RR interview, if that claim is substantiated. *See Cook*, 526 F. Supp. at 8 (noting that at least one witness's testimony suggested that removal was not likely for a first-time offender like Cook). Instead, the witnesses testified that, while they were not sure of the exact procedures that would take place, *some* form of disciplinary proceeding or further investigation would be instigated. And the witnesses also agreed that the failure to answer questions in an RR interview was likely to be categorized as

obstruction, a Class A violation.  Moreover, the unique paramilitary culture at KSP, which heavily emphasizes the duty to answer a superior's questions, only strengthens the conclusion that substantial discipline would result from the failure to do so, and it certainly reinforces the reasonableness of Elliotte's belief that he would face substantial penalties, a well.  Accordingly, based on the evidence of record and considering the totality of the circumstances presented in this case, the Court finds that the threatened punishment in this case was likely to occur had Elliotte refused to answer Sergeant Partin's questions during the RR investigation.

The Court next addresses the United States' contention that the Magistrate Judge improperly shifted the burden of proof to the United States. *See, e.g.*, [R. 91, pp. 13–14]. On this point, the United States takes issue with the following statements from the Recommended Disposition: "Significantly, no witness testified that a trooper's refusal to answer or cooperate would not result in substantial penalties," [R. 88, p. 62], and "[N]o witness testified this result [referring to Class A disciplinary proceedings] would be foreclosed or unlikely." *Id.* at 65; *see also* [R. 91, p. 13]. Citing to these statements, the United States argues that, "[r]ather than requiring the Defendant to prove that he *would* have faced punishment, the [Recommended Disposition] requires the government to prove that he would not." *Id.* at 13–14.

This is an inaccurate characterization of the Recommended Disposition, however. The Magistrate Judge thoroughly reviewed the evidence of record and the totality of the circumstances in the case and determined that "there is enough evidence on this record for the Court to conclude that the punishment for [refusing to answer questions] is more than speculative." [R. 88, p. 62]. In other words, the Magistrate Judge considered the evidence of record and found that Elliotte had satisfied his burden, based on that evidence. In pointing out that there was no evidence demonstrating that the threatened penalty was *unlikely*, it is clear the

Magistrate Judge was simply considering the totality of the circumstances before the Court, as required by *McKinley*. *See McKinley*, 404 F.3d at 436 n.20.  The United States is unable to explain how this resulted in a shifting of the burden of proof, and the Court finds its argument on this point to be meritless.

In sum, the Court finds that, based on the totality of the circumstances, Elliotte satisfied his burden of demonstrating the objective reasonableness of his belief that the threatened penalty, namely, Class A discipline in the form of demotion, suspension, or termination, was "likely to result" if he refused to answer questions during the RR investigation.

### c.  Was the RR process a non-routine administrative or criminal investigation?

The United States also argues that the Magistrate Judge's ruling was overly broad. [R. 91, pp. 21–25]. Specifically, the United States argues that Elliotte's initial phone (or radio) call,[35] his questioning at the hospital, and his subsequent recorded RR interview were all routine discussions.[36] *Id.* Should this Court adopt the Magistrate Judges' ruling, the United States argues, "the decision would function to grant immunity to any number of routine, voluntary, innocuous discussions, severing *Garrity* analysis entirely from the Fifth Amendment doctrine in which it is firmly rooted." *Id.* at 22. The United States insists that "[t]he practical effect of such a rule could be to essentially immunize public officials from criminal investigation simply because they are public officials." *Id.*

---

[35] While the Court and the parties often refers to this as a phone call, it is unclear whether this initial conversation occurred over the phone or the radio. *See* [R. 83, p. 208:10–11]. Partin's testimony suggests that it occurred through a radio call. *See* [R. 56:10–14].

[36] In his response, Elliotte suggests that the United States raises this argument only as to the August 18, 2020 discussions. *See* [R. 95, p. 21]. However, the Court understands that the United States also raises this argument with respect to the August 20, 2020 interview. *See* [R. 91, p. 24 (specifically referencing the RR interview)].

Before considering the three sets of communications in this case (the initial call, the hospital questioning, and the recorded RR interview), the Court turns to the case law cited by the United States. *See* [R. 91, pp. 93–94]. In *Cook* and *Dellinger*, the defendants argued that their statements, made in standard reports (both written and oral), were *Garrity*-protected. *Cook*, 526 F. Supp. 2d at 3 (completing written field report and use-of-force report after citizen complaint, as required by policies); *Dellinger*, 2013 WL 4177400, at *2 (completing video-recorded after-incident inquiry and written reports, required by policies); *see also Smith*, 821 F.3d at 1298 (completing standard duty report and incident report after death of an inmate, as required by regulations). In *Cook*, the district court disagreed for various reasons, among them that "Cook was not under either administrative or criminal investigation when [a superior] requested his reports." *Cook*, 526 F. Supp. at 8–9. The court explained:

> Cook cites no case, nor has the Court located any, to support the position that *Garrity* should be applied prior to the initiation of an administrative or criminal investigation. To interpret *Garrity* as defendant advocates would be both unprecedented and impracticable. It would mean that when a supervisor receives a complaint against an officer that has even the slightest potential of resulting in criminal charges, the supervisor could not follow up by requesting the standard paperwork without providing the officer with *Garrity* protections, because the request could be construed as an "order" to comply with an "investigation." This scenario would be unworkable for a number of reasons, not the least of which is that it would require line supervisors to make legal judgments about the potential criminality of the conduct alleged. Given the witnesses' testimony as to the frequency with which force is and must be used, extending *Garrity* protections to the moment a complaint is filed would create a tremendous and unnecessary administrative burden. The Court therefore declines to adopt this unwarranted extension of the *Garrity* doctrine.

*Id.* at 9. The *Dellinger* court found this analysis to be "directly on point," though it provided little discussion of the "routine" nature of the reports in its analysis. *Dellinger*, 2013 WL 4177400, at *3; *see also Smith*, 821 F.3d at 1303.

Similarly, in *Wendt*, 2023 WL 4248754, also cited by the United States, the district court discussed the difference between a government official's general obligation to answer questions posed by a supervisor and the situation "[a]t the other end of the spectrum," namely, "where a government employer has opened a formal investigation into a particular official's conduct and wants to question that official as part of the investigation." *Id.* at *6. In the former scenario, a government employee always feels "compelled" to answer a supervisor's questions, but to apply *Garrity* in such situations "would mean that any statement made by a government official in response to any question from a supervisor is privileged, no matter the context." *Id.* But "[n]othing in *Garrity* or its progeny suggests such a wide net." *Id.* On the other hand, in the context of a formal investigation, "*Garrity* is clearly implicated if the supervisor communicates to the official that failure to answer questions in and of itself will give rise to termination." *Id.*

With these cases in mind, the Court turns first to the recorded RR interview that took place on August 20, 2020. The Court finds that this specific discussion between Elliotte and Sergeant Partin falls somewhere between *Cook* and *Smith*—where the defendant-officers completed standard reports in response to use-of-force incidents—and the formal investigation discussed in *Wendt*. It is true, as the United States argues, that witnesses described an RR investigation as "routine." *See, e.g.*, [R. 83, p. 67:20–22]. But these statements must be read in context. For example, Sergeant Partin actually testified that RR investigations are routine because they are trigged by certain events, such as when there is a use of force resulting in an injury that requires medical treatment. *Id.* at 67:20–25. He did not testify that RR investigations are merely routine or standard reports prepared in the normal course of an officer's duties. *See Smith*, 821 F.3d at 1303 (citing Robert Myers, *Code of Silence: Police Shootings and the Right to Remain Silent*, 26 Golden Gate U.L.Rev. 497, 525–26 (1996)). And when Lieutenant Dingess

was asked whether RR investigations are routine, he responded that they are "mandated" but "not common."[37] [R. 83, p. 180:5–12]. But even assuming that the RR investigations are common, meaning they are not rare, that does not necessarily lead the Court to conclude that they are "routine," like standard reports prepared in the normal course of business. On this point, the United States has failed to identify any case law tying the frequency of a report or investigation to its "routineness." Moreover, even if the events that trigger an RR investigation (i.e., use of force) are perhaps not uncommon, those triggering events are certainly not "routine," nor are the resulting RR investigations.

Moreover, in the context of an RR interview, both the timing and the coercive atmosphere of that interview (on the facts of this case) further leads the Court to conclude that the interview was far different than the standard, routine reports referenced in *Cook* and *Dellinger*. For example, in *Dellinger*, the defendants completed a "recorded after-incident inquiry," which took place only one hour after the incident, and they were then told to complete written reports by the end of their shift. *Dellinger*, 2013 WL 4177400, at *2. From what the Court can tell, these were merely written and verbal statements by the officers to describe the events at issue (as opposed to investigatory question-and-answer interviews), much like the written reports referenced in *Cook*. Further, the fact that the *Dellinger* reports were required to be completed so promptly after the incidents at issue leads the Court to conclude that they were likely for the purpose of memorializing the events that took place, rather than investigating potential misuse of force (though that may have been another purpose). Additionally, in *Cook*, the supervising officer told the defendant to fill out the required reports "in the next couple of days," apparently on his own time and without a firm deadline—and certainly without being

---

[37] In fact, Partin testified that, during his approximately eight-year career as a KSP sergeant, he had conducted somewhere between eight and twelve RR investigations.  [R. 83, p. 14:17–21].

questioned by a superior. *Cook*, 526 F. Supp. 2d at 3. In the present case, however, Sergeant Partin ordered Elliotte to attend the interview at KSP offices, in an interrogation room, under more coercive conditions. *See supra* Section III(C)(1)(c) (discussing coercive nature of the interview). He then engaged in a question-and-answer interview with Elliotte, asking questions specific to Elliotte's involvement in the use-of-force incident. Clearly, then, this interview is distinguishable from the reports discussed above, and it was more than just a routine reporting requirement.

It is true, as the United States argues, that KSP did not suspect Elliotte or the other involved officers of specific misconduct at the time of the RR investigation. *See, e.g.*, [R. 83, p. 181:15–20]. Such misconduct is not necessary to trigger an RR investigation. *See, e.g.*, *id.* at 150:25, 151:1–5. Further, the RR investigation was not a *criminal* investigation. *See, e.g.*, *id.* at 67:12–19, 195:21. Importantly, however, the witnesses characterized the RR investigation as a type of internal investigation and, more specifically, an *administrative* investigation.[38] *See, e.g.*, *id.* at 67:12–19, 83:17–19, 195:12–13, 220:4–6; [R. 84, p. 33:12–14]. The United States does not dispute this characterization of the RR interview and seems instead to focus on the fact that Elliotte was not under indictment nor was he accused or suspected of misconduct at the time of the interview. *See* [R. 91, pp. 24–25].

But this argument glosses over the witnesses' repeated characterization of the RR process as an administrative investigation and, moreover, it ignores the purpose of the RR investigation and its connection to Internal Affairs. As already explained, the purpose of an RR investigation

---

[38] In *Cook*, the district court briefly noted that one witness had characterized the collection of reports as an "informal administrative investigation," but the court found the characterization to be "of no relevance to the *Garrity* inquiry." *Cook*, 526 F. Supp. 2d at 9 n.12. But in that case, the evidence (including the relevant workplace policies) indicated that the administrative investigation began only after referral of the citizen complaint to the appropriate section of the Department of Justice, not upon the mere collection of reports. Here, by contrast, multiple witnesses characterized the RR investigation as an administrative investigation, and there is no evidence (or argument) suggesting that additional steps were needed to trigger an administrative investigation.

is to determine whether the organization's internal policies and procedures have been violated—i.e., did the officer use an appropriate amount of force. *See, e.g.*, [R. 59-5, p. 1 (explaining purpose of the RR Policy); R. 83, p. 168:7–13 (Dingess explaining same)]. The investigation can be prompted by Internal Affairs, and RR reports of unreasonable force are forwarded to the Internal Affairs division, which can then base its own investigation on that RR report and its accompanying materials—sometimes relying entirely upon the evidence collected during the RR investigation. In other words, an RR investigation can provide the building blocks for an Internal Affairs investigation, which can in turn investigate criminal acts as well as policy violations. *See, e.g.*, [R. 83, pp. 11:13–24, 45:4–18, 196:12–20]. In that sense, RR reports can eventually lead to not only internal discipline, but criminal prosecution. *Id.* at 13:10–18. All witnesses testified consistently on these points.

Having considered this evidence, and the totality of the circumstances presented, the Court concludes that the August 20, 2020 interview between Elliotte and Sergeant Partin was not a routine matter in the context of *Garrity*. Instead, the interview was part of an administrative investigation for the purpose of determining whether misconduct occurred, and it had the potential to ripen into disciplinary and even criminal proceedings. In this sense, RR investigations differ significantly from standard citations and reports. The RR interview is therefore subject to *Garrity* protections.

The Court next considers Sergeant Partin's questioning of Elliotte at the hospital on August 18, 2020. After being notified of the use-of-force incident, Sergeant Partin ordered Elliotte to take Hamblin to the hospital, where Sergeant Partin would then meet him. *Id.* at 208:20–24. Once at the hospital, Sergeant Partin asked Elliotte more questions about the circumstances of Hamblin's arrest and Hamblin's injuries. *Id.* at 29:25, 30:1–3, 209:11–14. He

also directed Elliotte (and Lovett) to pose for photographs and took pictures of their face, hands, clothing, and so on. *Id.* at 30:4–8, 209:8–10. This interaction at the hospital was not recorded. *Id.* at 32:10–12. However, Elliotte and Partin did briefly testify about the hospital questioning. Elliotte, for example, testified that the hospital conversation "was a little more detailed" than his initial call with Sergeant Partin, but "it was all related to the use of force." *Id.* at 227:2–5. Elliotte also testified that he answered Sergeant Partin's questions at the hospital because KSP's policies required him to cooperate, or else face substantial penalties. *Id.* at 209:17–25, 210:1–3. Sergeant Partin similarly testified that, at the hospital, he "had a brief conversation with [Elliotte] . . . just to kind of get the who, what, when, where" information about the use-of-force incident. *Id.* at 56:20–25, 57:1–2. When asked whether the RR investigation was "the only reason" he was speaking to Elliotte on August 18 and August 20, 2020, Partin responded in the affirmative. *Id.* at 32:21–25, 33:1–2. And when asked if these various conversations were "to advance or facilitate the [RR] investigation," Partin again answered in the affirmative. *Id.* at 33:7–12.

Beyond this information, little evidence has been presented regarding the August 18, 2020 hospital questioning. The evidence outlined above makes certain points clear, however. First, Elliotte's discussion with Sergeant Partin at the hospital was investigatory in nature and involved a question-and-answer format similar to the more coercive RR interview (and distinguishable from the standard, routine reports referenced in other cases like *Cook* and *Dellinger*). And, in fact, the hospital questioning appears to have been somewhat coercive as well, with Elliotte being ordered to meet Partin at the hospital (not unlike the way he was ordered to meet him at the KSP post for his RR interview), and Partin asking questions of Elliotte, and even taking photographs of his body and clothing. Moreover, and perhaps more importantly, the evidence indicates that the hospital questioning was part of the RR investigation. In other words,

Sergeant Partin's questioning of Elliotte at the hospital was part of an internal investigation into potential misconduct. It also appears that the questions were narrowly related to the scope of Elliotte's employment and the operations of KSP. *See generally* [R. 55-14, p. 4 ¶ 10 (Obstruction Policy)]. As a result, Elliotte's refusal to answer questions during that interaction would likely have resulted in a disciplinary proceeding, specifically for obstructing an internal investigation, a Class A violation punishable by demotion, suspension, or termination. On this point, the Court notes that no witness testified that the hospital questioning occurred prior to or separately from the RR investigation.

The United States notes that none of the KSP officials testified that they believed the hospital questioning to be *Garrity*-protected. [R. 91, pp. 21–22]. The Court acknowledges that these witnesses did not specifically reference the August 18, 2020 hospital interaction. However, Kincer did address a question about a hypothetical hospital setting. She agreed that "when a sergeant of a Kentucky State Police post goes to a trooper in a hospital or another setting and says, Son, I need to know how somebody in your custody got their face smashed, that's a serious matter." [R. 83, p. 159:9–14]. Captain Green testified similarly. [R. 84, p. 71:3–10 (stating that he would have felt that he had to answer the questions posed to him by his sergeant if questioned similarly in the emergency room)]. This testimony further reinforces that the hospital questioning on August 18, 2020 was part of an investigation into potential misconduct—a serious matter. Furthermore, all witnesses clearly testified to their belief that the failure to answer questions during an RR investigation, which they characterized as an internal administrative investigation, would qualify as obstruction, which would in turn result in demotion, suspension, or termination under KSP's policies. None of the witnesses limited their testimony on this point to only the recorded interview portion of an internal investigation.

Accordingly, having considered the totality of the circumstances, the Court finds that Elliotte has satisfied his burden of demonstrating a credible subjective belief that he would face substantial penalties for failing to answer questions at the hospital on August 18, 2020. And for the reasons outlined above, he has also satisfied his burden of demonstrating that this belief was objectively reasonable. The Court will therefore grant the Motion to Suppress to the extent it seeks to suppress the statements from the August 18, 2020 hospital conversation.

Finally, the Court considers Elliotte's initial call to Sergeant Partin in the early morning hours of August 18, 2020. While Elliotte testified that he was required by the RR Policy to initiate that conversation with Sergeant Partin, [R. 83, p. 223:3], there are no facts suggesting that the initial phone (or radio) discussion was coercive in nature, or even that it was a question-and-answer type of conversation. It appears instead that the call was for the mere purpose of reporting the use of force incident, so the supervising officer could then provide further direction and begin the RR investigation, as necessary. [R. 83, p. 222:12–17 (Elliotte testified: "I said, We've had an altercation with a guy. He's going [to] have to receive medical treatment. I said, Do you want to come to the scene, or do you want to meet me at the hospital? What do I do with him? And he said, I need you to meet me at the hospital with him, and I'll meet you there.")]. In fact, Elliotte was asked whether that conversation "was largely just what happened?" and he responded, "What happened with the use of force." *Id.* at 226:24–25, 227:1. Very little evidence (and argument) has been presented regarding this call, and the Court finds that, to the extent Elliotte seeks to suppress his statements during the call, he has failed to satisfy his burden of demonstrating that any subjective belief was objectively reasonable. The Court will therefore deny the Motion to Suppress to the extent it seeks to suppress the statements from the August 18, 2020 phone (or radio) call to Sergeant Partin.

As noted above, the United States argues that the Magistrate Judge's ruling is overly broad and unnecessarily expands *Garrity*. To the extent that this argument was based on the Magistrate Judge's proposed suppression of the initial call on August 18, 2020, this concern has been addressed. But to the extent that the United States believes that this Court's ruling regarding the August 18, 2020 hospital questioning and the August 20, 2020 interview is similarly overbroad, the Court emphasizes that its holding is limited to the unique facts presented in this case. These unique facts include, but are not limited to, KSP's Obstruction Policy, which threatens officers with substantial employment-related penalties (demotion, suspension, or termination) if they refuse to answer the questions put to them during an internal investigation; testimony from multiple witnesses that the RR investigation was a form of internal administrative investigation; and testimony from multiple witnesses that an officer would be guilty of violating the Obstruction Policy if he failed to answer questions during an RR interview. Given the unique facts of the case and the breadth of the evidence presented, the Court's findings are necessarily limited and do not serve to unnecessarily expand *Garrity* as the United States suggests.

In sum, the Court has considered the ultimate question in this case: whether, at the time of the RR investigation, Elliotte held a reasonable belief that he was required to answer questions or else face substantial penalties. Simply put, on the record before the Court, Elliotte held such a belief and it was reasonable. KSP's policies, and specifically the Obstruction Policy, when taken together and read in conjunction with the testimony of the witnesses—including the very people who interpret and implement these policies—establish a reasonable belief that the failure to answer questions during the RR investigation could result in substantial penalties (namely, demotion, suspension, or termination).

The Court has therefore considered the totality of the circumstances in this case and finds that Elliotte has satisfied his burden of demonstrating that he subjectively believed that he was likely to face substantial penalties if he failed to respond to the RR questioning, and this belief was objectively reasonable, with respect to his statements during the August 18, 2020 hospital questioning and the August 20, 2020 RR interview. These statements are therefore immunized by *Garrity* and may not be used against Elliotte in this criminal proceeding, subject to the exception discussed below. The Court will therefore grant the Motion to Suppress to the extent Elliotte seeks to suppress these statements. To the extent Elliotte seeks to suppress the statements made during his initial call with Sergeant Partin on August 18, 2020, said statements are not *Garrity*-protected, for the reasons discussed above. The Court will therefore deny the Motion to Suppress as to those statements.

### D.  Further Proceedings

For the reasons set forth above, the Court has determined that Elliotte's statements during the August 18, 2020 hospital questioning and the August 20, 2020 RR interview are subject to *Garrity* protections. Thus, those statements cannot be used against Elliotte in this criminal proceeding, though some exceptions may apply, and further proceedings may prove necessary.

First, *Garrity* "precludes use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation." *McKinley*, 404 F.3d at 427 (citing *Garrity*, 385 U.S. at 500). However, *Garrity* does not preclude the use of those protected statements in prosecutions for independent crimes like obstruction of justice or perjury. *Id.* (citations omitted). Thus, even though the Court has ruled that the above-referenced statements are *Garrity*-protected, this means only that they cannot be used against Elliotte in any trial on Counts I and II (the civil rights violations). However, *Garrity* does not immunize these

statements from use in a trial on Counts III and IV (the obstruction of justice charges). It is possible, then, that Counts I and II may need to be severed from Counts III and IV.

Moreover, "[u]se of the compelled testimony is not only prohibited but any and all evidence derived from that compelled testimony is likewise inadmissible." *United States v. Ford*, 176 F.3d 376, 381 (6th Cir. 1999). This rule stems from *Kastigar v. United States*, in which "the Supreme Court held that in any subsequent criminal prosecution of a person granted immunity to testify, the prosecution bears the burden of affirmatively proving that all evidence proposed for use at trial was derived from legitimate sources totally independent of the compelled testimony." *Id.* Thus, when a defendant proves that he provided immunized statements, it "shift[s] to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Kastigar v. United States*, 406 U.S. 441, 461–62 (1972) (citations omitted). To determine if the United States can satisfy this burden, the Court must conduct a "*Kastigar* hearing." *See United States v. Mendizabal*, 214 F. App'x 496, 501 (6th Cir. 2006) (citations omitted); *Ford*, 176 F.3d at 381. "A hearing of this type requires the prosecution to present all of the evidence intended for trial and identify the sources of that evidence to make sure that it was not derived from or based on the inadmissible compelled testimony." *Ford*, 176 F.3d at 381.

Accordingly, the Court will refer this matter to the Magistrate Judge for the purpose of scheduling a status conference with the parties to discuss the necessity of a *Kastigar* hearing, and the timeline for completing such a hearing and any briefing that may be required. The Magistrate Judge will also discuss the possibility of severing Counts I and II (the civil rights violations) from Counts III and IV (the obstruction of justice charges).

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** as follows:

1. Defendant Elliotte's Motion to Suppress Evidence Subject to *Garrity v. New Jersey*, [R. 55], is **GRANTED IN PART** and **DENIED IN PART**.

   a. The Motion is **GRANTED** to the extent Elliotte seeks to suppress his statements made during the August 18, 2020 hospital questioning and the recorded August 20, 2020 RR interview, and any evidence derived from those statements, from the United States' case-in-chief with respect to Counts I and II (the civil rights violations).

   b. The Motion is **DENIED** to the extent Elliotte seeks to suppress statements made during his initial phone or radio call with Sergeant Partin on August 18, 2020.

2. The parties **SHALL** contact the Magistrate Judge's chambers for the purpose of scheduling a status conference, as discussed above.

This the 22nd day of November, 2023.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY